IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

FILED BY CLERK

OCT -4 2012

COURT OF APPEALS
DIVISION TWO

JAMES and JEAN GORMAN, married          )
persons; THE BRAD P. GORMAN             )
MEMORIAL FUND,                          )
                                        )
                                        )      2 CA-CV 2012-0037
                    Plaintiffs/Appellants, )    DEPARTMENT B
                                        )
            v.                          )      O P I N I O N
                                        )
PIMA COUNTY, a municipal corporation,   )
                                        )
                    Defendant/Appellee. )
                                        )
_____ )

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. C20109071

Honorable Ted B. Borek, Judge

AFFIRMED IN PART, REVERSED IN PART AND REMANDED

Waterfall, Economidis, Caldwell,
 Hanshaw & Villamana, P.C.
  By Corey B. Larson                                              Tucson
                                           Attorneys for Plaintiffs/Appellants

Barbara LaWall, Pima County Attorney
 By Lesley M. Lukach, Andrew L. Flagg,
    and Michael D. LeBlanc                                        Tucson
                                           Attorneys for Defendant/Appellee

V Á S Q U E Z, Presiding Judge.

¶1 James and Jean Gorman and the Brad P. Gorman Memorial Fund (collectively, the Gormans) appeal from the trial court's grant of summary judgment dismissing their breach of contract and estoppel claims against Pima County (the County). The Gormans contend the court erred as a matter of law in concluding no contract existed between them and the County. They also argue that even if there was no contract, the court erred by not finding the County "should nonetheless be estopped from denying its liability to [them]." For the reasons stated below, we affirm in part and reverse and remand in part.

## Factual and Procedural Background

¶2 We view the facts in the light most favorable to the party opposing the entry of summary judgment, in this case the Gormans. *See Tissicino v. Peterson*, 211 Ariz. 416, ¶ 2, 121 P.3d 1286, 1287-88 (App. 2005). On September 30, 1999, the Gormans's son, Brad Gorman, was killed while bicycling on Catalina Highway. In December of that year, the Gormans established the Brad P. Gorman Memorial Fund[1] (the Memorial Fund) to promote bicycle safety and education in Pima County. Over the following years, the Gormans worked with the County on numerous bicycle-safety initiatives, including acquiring federal funds to extend bicycle lanes on Catalina Highway, which later became known as the Brad P. Gorman Memorial Bikeway.

¶3 In March 2000, Jean Gorman contacted Pima County Administrator Charles Huckelberry about building a memorial bike park and "saddle-up" area near the

---

[1]The Memorial Fund is a non-profit fund established under the auspices of the Perimeter Bicycling Association of America, Inc. (PBAA). Jean Gorman is chairperson of the Memorial Fund and directs the allocation of funds.

base of Mount Lemmon to provide a safe place for cyclists to park and meet before riding on the mountain. It later would become known as "the Brad P. Gorman Memorial Bicycle Park and Ride Area Project" (the Project). Huckelberry responded favorably, and early discussions of the Project included the possible construction of a parking area, shade structures, water fountains, and restrooms.

¶4 By 2002, county officials identified a potential location for the Project on the northwest corner of East Camino Miramonte and Catalina Highway (the Camino Miramonte location) within the Pima County Regional Flood Control District (Flood Control District). However, despite early progress, by 2008 the Project came to a standstill. The Gormans were informed by Matt Zoll, Bicycle and Pedestrian Program Manager for the County Department of Transportation, and Steve Anderson, Principal Planner of Pima County Natural Resources, Parks, and Recreation, that although the scope and location of the Project had been determined by county officials, the County could not move forward due to a lack of funding and final approval by Huckelberry.

¶5 On October 25, 2008, Jean Gorman sent a letter to Huckelberry about the Camino Miramonte location. Gorman described the location as "perfect" and indicated that she understood funds were lacking but wished "to complete the [P]roject with [her] personal funds and donations upon approval" from the County. Huckelberry responded with a letter on November 3, 2008, indicating the County would be "honored" if she took "those actions necessary to fund" the Project, and the County would "assist as [it could]."

¶6 By the spring of 2009, the Project once again gained momentum. The Gormans were able to secure partial funding for the Project from the Regional

3

Transportation Authority (the RTA) in the amount of $80,000, and county officials had selected designers and engineers for the Project and approved their contracts. In November 2009, plans for the Project were submitted to Pima County Development Services, and, in December, the County issued a building permit and began soliciting bids from contractors. But despite the apparent availability of RTA funding, at Zoll's and Anderson's request, the Gormans used their personal funds to pay the designers, engineers, and others for their services.

¶7        In late December 2009, the County informed the Gormans for the first time that it might be cancelling the Project. And, in February 2010, Priscilla Cornelio, Director of the County Department of Transportation, notified them by letter that the Project at the Camino Miramonte location would not be pursued due to complaints by surrounding property owners. The letter also indicated that other possible locations were being explored, but, to date, the County apparently has taken no significant action on the Project.

¶8        In November 2010, the Gormans filed this lawsuit against the County, alleging breach of contract, equitable estoppel, and negligent misrepresentation. The parties filed cross-motions for summary judgment, and, after hearing argument, the trial court granted summary judgment in favor of the County on all claims. This appeal followed. We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1) and 12-2101(A)(1).

**Discussion**

**Breach of Contract**

¶9        The Gormans first argue the trial court erred by granting summary judgment to the County on their breach of contract claim.  Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Ariz. R. Civ. P. 56(c).  On appeal from summary judgment, we determine de novo whether there is any genuine issue of material fact and whether the trial court erred in applying the law.  *Bothell v. Two Point Acres, Inc.*, 192 Ariz. 313, ¶ 8, 965 P.2d 47, 50 (App. 1998).

¶10        The Gormans contend they had a contract with the County to cooperatively construct the Project at the Camino Miramonte location.  They maintain Jean Gorman's October 25, 2008 letter to Huckelberry constituted an offer, and his return letter dated November 3, 2008 was an acceptance.  They also argue that, contrary to the conclusion reached by the trial court, Huckelberry, as the "chief executive officer" of Pima County, had express authority to bind the County pursuant to Pima County Code (P.C.C.) § 2.12.070(M).

¶11        In response, the County maintains "the 2008 letters lack any specific terms that set forth the obligations of [the Gormans] or the County," and, therefore, no enforceable contract was formed.  It also argues "[n]o statute or ordinance delegates to [Huckelberry as the County Administrator] the authority to bind the County in contract."  The County asserts that P.C.C. § 2.12.070(M) applies only to federal, state, and public grants and that its arrangement with the Gormans cannot be so classified.  The County

5

further contends that even if the Gormans's expenditure of funds could be considered a "public grant," P.C.C. § 2.12.070(M) "is not a broad delegation of contracting authority" from the County Board of Supervisors (the Board) to Huckelberry.

¶12        When interpreting a statute or ordinance, our primary goal is to determine and give effect to the enacting body's intent. *City of Phoenix v. Yates*, 69 Ariz. 68, 71, 208 P.2d 1147, 1149 (1949); *Kahn v. Thompson*, 185 Ariz. 408, 412, 916 P.2d 1124, 1128 (App. 1995). We look first to the language of the statute or ordinance as the best indicator of that intent. *Mathews ex rel. Mathews v. Life Care Ctrs. of Am., Inc.*, 217 Ariz. 606, ¶ 6, 177 P.3d 867, 869 (App. 2008). If the language is clear and unambiguous, our duty is simply to apply the plain language. *Id*. Moreover, we use a common-sense approach and strive to harmonize all related provisions. *Morgan v. Carillon Invs., Inc.*, 207 Ariz. 547, ¶ 7, 88 P.3d 1159, 1161 (App. 2004).

¶13        In Arizona, a county may exercise its powers "only by the board of supervisors" or by its agents or officers, where permitted by law, acting pursuant to the board's authority. A.R.S. § 11-201(A); *see also* A.R.S. § 11-202(A) (county has powers provided by state law and those implied therefrom). The board's statutory powers and duties include the authority to adopt, amend, and repeal county ordinances that are necessary to carry out the duties, responsibilities, and functions of the county, § 11-251.05(A)(1), and to "[m]ake such contracts . . . as may be necessary to the exercise of its powers," § 11-201(A)(3). Arizona statutes also name certain "county officers" and describe their powers and duties, but the office of county administrator is not among those enumerated. *See* A.R.S. §§ 11-401 through 11-600.

6

¶14 Here, however, the Pima County Board of Supervisors established the office of Pima County Administrator as the County's "chief executive officer," P.C.C. § 2.12.020, responsible for the "general direction, supervision, administration, and coordination of all affairs of the county," P.C.C. § 2.12.070. Although specific powers and duties are delegated to Huckelberry by the Board pursuant to the Pima County Code, the Board has not delegated to him general contracting authority.[2] *See* P.C.C. § 2.12.070.

¶15 The Gormans nonetheless contend P.C.C. § 2.12.070(M) provides such authority because, under that ordinance, "[t]he county administrator is authorized to sign federal, state and public grant applications, agreements, assurances and other pertinent grant documents prepared or received by all county departments." And, they argue P.C.C. § 2.12.070(M) applies here because their offer to use their personal funds for the Project was a "public grant" to the County under both the common meaning and the County's own definition of that term.

¶16 The Gormans's reliance on P.C.C. § 2.12.070(M) is misplaced. First, we disagree that their offer to fund the Project constituted a "public grant." We believe the "public" versus "private" distinction is determined by the source of the grant funds and not, as the Gormans contend, by the purpose for which the funds are used. Second, even if the donation was a public grant, we agree with the trial court that Huckelberry's authority concerning such grants is limited. Although the Pima County Code grants Huckelberry the authority to sign grant applications and other grant documents, P.C.C.

---

[2]The Pima County Code expressly delegates some contracting authority to the procurement director. *See, e.g.*, P.C.C. § 11.08.010(B)(5) (procurement director has authority to award and execute contracts up to $250,000).

7

§ 2.12.070(M), the Board's "Policy for Accepting and Administering Grants" provides that "[a]ll grants must be accepted and approved by the Board prior to receipt and expenditure of grant funds," Pima Cnty. Bd. of Supervisors Policy D 22.6(C)(1). Thus, as the court concluded, "[f]inal approval rest[ed] with the Board."

¶17 Although the Gormans argue that "a governmental entit[y's] policies may not overrule or contradict a specific statute," we perceive no conflict between the Pima County Code and the Board's policy on grants. Section 2.12.070(M) of the P.C.C. provides the county administrator with the authority to sign certain grant documents, but nothing in that section authorizes him to give final approval for the receipt of grant funding. Moreover, that code provision states that the county administrator's authority is limited by "policies adopted or directions given by official actions of the board." P.C.C. § 2.12.070(A). Thus, the County's policy on grants is consistent with the Pima County Code, and neither give Huckelberry the authority to independently approve the receipt of grant funding for the construction of county projects.

¶18 The Gormans argue further, however, that the County's policy on grants "simply states rules to be internally followed . . . [and] ha[s] no bearing on the County Administrator's authority to bind the County." We disagree. "The same principles of construction that apply to statutes also apply to administrative rules and regulations, . . . and a public entity's regulations, if consistent with its statutory scheme, are entitled to be given the force and effect of law." *Kaman Aerospace v. Ariz. Bd. of Regents*, 217 Ariz. 148, ¶ 29, 171 P.3d 599, 606 (App. 2007) (internal citations omitted).

8

**¶19**       In sum, the Gormans's claim for breach of contract predicated on Huckelberry's November 3, 2008 letter must fail because he was not authorized to accept a contract offer or grant funding on the County's behalf.[3]  In the absence of authorization from the Board, it is irrelevant that other Pima County officials also may have demonstrated their intent to bind the County.  *See id.* ¶ 23.  "Arizona law is clear that 'persons dealing with public officers are bound, at their peril, to know the extent and limits of their power and that no right can be acquired except that predicated upon authorized acts of such officers.'"  *Id.* ¶ 20, *quoting Pinal County v. Pomeroy*, 60 Ariz. 448, 455, 139 P.2d 451, 454-55 (1943).  The court did not err in granting summary judgment in favor of the County on the Gormans's claim for breach of contract.

**Estoppel**

**¶20**       The Gormans next argue the trial court erred by not finding the County "equitably estopped" from denying its liability to them.[4]  They contend that even if there

---

[3]Having reached this conclusion, we need not address the County's argument that Huckelberry also lacked authority to contractually bind the Flood Control District, within whose boundaries the Camino Miramonte location was situated.  The Gormans contend the Flood Control District in fact had approved the Project, and they maintain the argument is a "red herring" in any event because they are only seeking monetary damages and not specific performance.

[4]Here, the Gormans assert estoppel as a cause of action for damages, not as a defense.  In *Tiffany Inc. v. W.M.K. Transit Mix, Inc.*, 16 Ariz. App. 415, 419, 493 P.2d 1220, 1224 (1972), this court stated "equitable estoppel is available only as a defense, [and] promissory estoppel [is] used as a cause of action for damages."  However, we also noted "[w]e can find no authority for the proposition that estoppel must be specifically plead as equitable or promissory estoppel."  *Id.*  Although the Gormans' assert equitable estoppel, we conclude they also have alleged the elements of promissory estoppel.  "[B]oth forms require a justifiable right to rely" on the representations made by one party to the other.  *Trollope v. Koerner*, 106 Ariz. 10, 18, 470 P.2d 91, 99 (1970).  The critical

was no contract, the court erred in granting summary judgment in favor of the County because "the actions and representations of . . . Huckelberry and other Pima County officials are such that [the] County must be estopped from denying the agreement with [them] and should be compelled to repay the costs expended by [them]." We determine de novo whether there is any genuine issue of material fact and whether the trial court erred in applying the law. *Bothell*, 192 Ariz. 313, ¶ 8, 965 P.2d at 50.

**¶21** The three elements of estoppel are: "(1) the party to be estopped commits acts inconsistent with a position it later adopts; (2) reliance by the other party; and (3) injury to the latter resulting from the former's repudiation of its prior conduct." *Valencia Energy Co. v. Ariz. Dep't of Revenue*, 191 Ariz. 565, ¶ 35, 959 P.2d 1256, 1267-68 (1998). When applied to a government actor, the actions relied upon must bear some "considerable degree of formalism." *Id*. ¶ 36. Rarely will unwritten agreements meet the requisite formalism, and, "[i]n general, the state may not be estopped due to the casual acts, advice, or instructions issued by nonsupervisory employees." *Id*. Rather, estoppel applies only to the authorized acts of government officials when necessary to prevent a "serious injustice." *Freightways, Inc. v. Ariz. Corp. Comm'n*, 129 Ariz. 245, 248, 630 P.2d 541, 544 (1981). Finally, estoppel will not apply if it would be "'to the

distinction between the two is that equitable estoppel refers to reliance on a misrepresentation of some present or past fact, whereas "promissory estoppel rests upon a promise to do something in the future." *Id*. With that exception, "promissory estoppel includes all elements of equitable estoppel." *Weiner v. Romley*, 94 Ariz. 40, 45, 381 P.2d 581, 584 (1963). Accordingly, we rely on the decisions of this court and our supreme court that address both types of estoppel to the extent the legal principles and rationale in those cases apply to both.

detriment of the public interest.'" *Pingitore v. Town of Cave Creek*, 194 Ariz. 261, ¶ 24, 981 P.2d 129, 133 (App. 1998), *quoting Valencia*, 191 Ariz. 565, ¶ 32, 959 P.2d at 1267.

¶22        The Gormans argue the requirement of a considerable degree of formalism "is perhaps better stated as a requirement that a position be reduced to writing." They point to several writings they believe support their estoppel claim, including Huckelberry's October 25, 2008 letter to Jean Gorman, the County's issuance of a building permit and billing statements, the hundreds of messages exchanged among the parties via electronic mail (e-mail), and the amendment to an intergovernmental agreement between the County and the RTA. In contrast, the County argues the formalism requirement involves more than a mere writing, and, to support estoppel against the government, "the government itself must act" and "the County Administrator's lack of authority to contractually bind the County in this case similarly means" his actions cannot support the application of estoppel. The trial court agreed with the County and rejected the Gormans's estoppel claim on the basis that Huckelberry was not authorized to act.[5]

¶23        We agree with the County that the formalism necessary to support an estoppel claim against the government requires something more than a mere writing. A

---

[5]To the extent the County argues and the trial court concluded the degree of formality necessary to support a claim of estoppel is the same required for a valid contract, we disagree. "Although a promise made enforceable by promissory estoppel is similar to a binding contractual promise, a[n] estoppel claim" arises out of equity, not contract liability. *Double AA Builders, Ltd. v. Grand State Constr. L.L.C.*, 210 Ariz. 503, ¶ 45, 114 P.3d 835, 843 (App. 2005); *see also Kersten v. Cont'l Bank*, 129 Ariz. 44, 47, 628 P.2d 592, 595 (App. 1981) (estoppel may afford relief if "some element necessary to the creation of an enforceable contract, such as consideration, is not present").

11

writing, just like an oral statement, has the potential of expressing no more than an "off-the-cuff opinion" when the situation demands "research or deliberation." *Valencia*, 191 Ariz. 565, ¶ 36, 959 P.2d at 1268; *see also Lowe v. Pima County*, 217 Ariz. 642, ¶ 39, 177 P.3d 1214, 1223 (App. 2008) (casually worded e-mail lacked required formality). But here, Huckelberry's letter cannot be construed reasonably as a mere "off-the-cuff opinion" about the Project. And, even though he lacked specific authority to approve contracts for private grant funding, he arguably was "a person authorized to act in the area under consideration." *Valencia*, 191 Ariz. 565, ¶ 36, 959 P.2d at 1268; *see also* P.C.C. § 2.12.070 (county administrator responsible for the "general direction, supervision, administration, and coordination of all affairs of the county"). Additionally, the County's building permit, based on its approval of the plans paid for by the Gormans, could be viewed as providing an added degree of formalism. *See Pingitore*, 194 Ariz. 261, ¶ 25, 981 P.2d at 133. And, even if these documents standing alone did not attain the degree of formality required to support a claim of estoppel, the Amendment to Intergovernmental Agreement Number 01-04-R-140463-1207 (the Amendment) between the County and the RTA provides "some considerable degree of formalism under the circumstances," and, thus, was sufficient, particularly in view of the other documents noted above. *See Valencia*, 191 Ariz. 565, ¶ 36, 959 P.2d at 1268; *Pingitore*, 194 Ariz. 261, ¶ 25, 981 P.2d at 133 (permits and variances granted by town inconsistent with its later issuance of stop-work orders). We therefore conclude the trial court erred in dismissing the Gormans's estoppel claim.

¶24 Under the Amendment, effective June 26, 2009, construction and funding of the Project were added to Intergovernmental Agreement Number 01-04-R-140463-1207 (IGA) providing funding for a number of bicycle and pedestrian safety initiatives. The Amendment was signed by the Chairman of the Board and countersigned by the Chairman of the RTA board, and it provided that the Project's "estimated cost of $80,000" would not require additional funding from the County because "there [were] sufficient funds in the existing agreement." Notably, the estimated cost was for the construction of the Project at the Camino Miramonte location—the only location that had been considered at that time. "To [the Gormans, the Amendment to the IGA] could have appeared to be the [County's] official, unequivocal position on the question" of whether the Project would go forward. *Valencia*, 191 Ariz. 565, ¶ 43, 959 P.2d at 1270. Thus, when the County notified Jean Gorman on February 9, 2010, that this location "ha[d] been discarded," it adopted a position inconsistent with its earlier act of approving the Amendment to include the Project as part of the IGA. A jury reasonably could find this satisfies the first element of estoppel.[6] *Valencia*, 191 Ariz. 565, ¶ 35, 959 P.2d at 1267.

---

[6]In addition to the Amendment, other actions were taken and approvals given by the County and its officials concerning the Project, and, in particular, the Project's financing. In September 2008, Zoll and Anderson informed the Gormans that the only remaining obstacles to the Project moving forward were final approval by Huckelberry and the securing of all necessary funding. And in response to Jean Gorman's October 2008 letter, Huckelberry responded that the County would be honored if the Gormans would take "those actions necessary to fund" the Project; he never corrected their erroneous belief that final approval for the Project rested with him. The County also selected the Project's designers and engineers, approved their contracts, and asked the Gormans to pay them; issued a building permit; and began soliciting bids from contractors. Although none of these actions, standing alone, may be sufficient to support a claim of estoppel, the totality of these actions reasonably could be construed as the

13

¶25 The second element requires the Gormans to demonstrate they relied on the action taken by the County and their reliance was "reasonable under the circumstances." *Valencia*, 191 Ariz. 565, ¶ 37, 959 P.2d at 1268. The Gormans contend they were the driving force behind the County's adoption of the Amendment, which memorialized their success in obtaining $80,000 of RTA funds intended for the Project. Thereafter, in reliance at least in part on the Amendment, the Gormans "began the process of formalizing the design for the project at Camino Miramonte." Jean Gorman indicated that she "spent hundreds of hours traveling to the site" to review designs with County officials, architects, and engineers. Most notably, it was only after the Gormans secured RTA funding via the Amendment that the County asked them to spend over $30,000 of their own funds to begin paying the Project's designers and engineers the County had hired. In view of the Amendment, and the years of cooperation and negotiations between the parties, the record supports a conclusion the Gormans's reliance was reasonable.

¶26 The final element of estoppel requires the Gormans to establish they were injured by the County's repudiation of its prior conduct. *Id.* ¶ 35. As reflected in the above details, the record contains evidence that the Gormans expended a considerable amount of their own money, time, and effort on the pre-construction phase of the Project, only thereafter to be told the Project would not be pursued. Additionally, there remains a

---

County's promise that if the Gormans provided the necessary funding, the County would proceed with the Project at the Camino Miramonte location. *See Pingitore*, 194 Ariz. 261, ¶ 25, 981 P.2d at 133 (relying on totality of actions and representations made by town to find first element of estoppel established).

14

genuine issue of material fact regarding the extent of that injury.[7] We therefore reverse the grant of summary judgment in favor of the County on the Gormans's claim of estoppel and remand for further proceedings.

¶27        The County argues that if estoppel is applied here, in the future, it will be estopped from denying the existence of a contract based on the unauthorized acts of its employees. But we have carefully considered the potential impact on the public interest, and application of estoppel in this case will not "substantially and adversely affect the exercise of governmental powers" in the future. *See Valencia*, 191 Ariz. 565, ¶ 54, 959 P.2d at 1272 (application of estoppel appropriate when no prospective consequences or "undue damage" to public interest). The circumstances here are unlikely to recur and equity favors our resolution. *See Pingitore*, 194 Ariz. 261, ¶ 30, 981 P.2d at 134.

---

[7]On the question of damages, the County argues the Memorial Fund is an unincorporated organization without capacity to sue. Relying on *Associated Students of University of Arizona v. Arizona Board of Regents*, 120 Ariz. 100, 102, 584 P.2d 564, 566 (App. 1978), the trial court apparently agreed but nevertheless resolved the issues primarily on other grounds. On appeal, the County similarly asks us to "dismiss the [Memorial] Fund as a party" to the appeal. It maintains because the Gormans's donations and loans were funneled through the Memorial Fund, they "failed to demonstrate below that they were personally entitled to recover under the alleged contract" and cannot demonstrate how much of the funds expended were traceable to them as opposed to others. Although we agree with the County that the Gormans have not argued the court's ruling was in error, and therefore have waived the argument, we cannot say the joinder of the Memorial Fund was indispensible to the Gormans's claims because they allege the source of expenditures here are directly traceable to their personal donations and loans. We thus agree with the Gormans that this is a question of fact we cannot resolve on the record before us.

**Disposition**

¶28        For the reasons stated, the trial court's summary judgment in favor of the County is affirmed in part and reversed in part, and we remand for further proceedings consistent with this opinion.

/s/ *Garye L. Vásquez*
GARYE L. VÁSQUEZ, Presiding Judge

CONCURRING:

/s/ *Philip G. Espinosa*
PHILIP G. ESPINOSA, Judge

/s/ *Stephen F. McCarville*
STEPHEN F. McCARVILLE, Judge*

*A judge of the Pinal County Superior Court authorized and assigned to sit as a judge on the Court of Appeals, Division Two, pursuant to Arizona Supreme Court order filed August 29, 2012.

16