NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association, *Plaintiff/Appellee*,

*v.*

CROWN CITY PROPERTIES, L.L.C., an Arizona limited liability company; JOHN D. WRIGHT and NANNETTE WRIGHT, husband and wife; MICHAEL J. HERLIHY and MARGUERITE N. HERLIHY, as Trustees of the Michael J. & Marguerite N. Herlihy Family Trust dated December 13, 1999, *Defendants/Appellants*.

No. 1 CA-CV 13-0248
FILED 05-27-2014

---

Appeal from the Superior Court in Maricopa County
No.  CV2009-028547
The Honorable Lisa Daniel Flores, Judge

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED**

---

COUNSEL

Quarles & Brady LLP, Phoenix
By Scott A. Klundt, Brian A. Howie and Lauren Elliott Stine
*Co-Counsel for Plaintiff/Appellee*

Ivy L. Kushner, Attorney at Law, Scottsdale
By Ivy L. Kushner
*Counsel for Defendants/Appellants*

---

**MEMORANDUM DECISION**

Judge Andrew W. Gould delivered the decision of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge Maurice Portley joined.

---

**G O U L D**, Judge:

¶1 Crown City Properties, L.L.C., John D. and Nannette Wright, Michael J. and Marguerite N. Herlihy, and The Michael J. & Marguerite N. Herlihy Family Trust dated December 13, 1999 (collectively, the "Appellants") appeal from the trial court's judgment entered in favor of Wells Fargo Bank, National Association ("Wells Fargo").[1]  For the reasons discussed below, we affirm the judgment in part, vacate it in part, and remand for further proceedings consistent with this decision.

**FACTS AND PROCEDURAL HISTORY**

¶2 This case arises from a guaranty executed in connection with a construction loan.  In December 2005, Wells Fargo executed a construction loan with Loop 76, L.L.C. ("Loop 76"), for the purpose of constructing three commercial office/storage buildings.  Pursuant to the Construction Loan Agreement and Promissory Note (the "Loan Documents"), Loop 76 promised to pay the principal amount of the loan plus interest, late fees, professional consultant's fees, and attorney's fees and costs incurred by Wells Fargo in connection with enforcement of the loan.

¶3 Appellants are owners of membership interests in Loop 76. Appellants personally guaranteed repayment of the loan, as well as all indebtedness owed by Loop 76 in connection with the loan.

¶4 The note for the loan was originally scheduled to mature on February 2, 2008, but was later extended to December 31, 2008.  On July 20, 2009, Loop 76 filed for bankruptcy. Loop 76 and Appellants eventually defaulted under the terms of the loan and the guaranty, and never paid

---

[1]  The Kraus Family Trust was previously dismissed as a defendant in this case and is not a party to this appeal.

the amounts due under the loan.  On September 8, 2009, Wells Fargo filed a lawsuit against Appellants for breach of the guaranty.

**¶5**     The court held a three-day bench trial in December 2012. After the trial, the court entered judgment in favor of Wells Fargo in the amount of $28,554,367.37; Appellants filed a timely appeal.

## DISCUSSION

**¶6**     We review the record on an appeal from a bench trial in the light most favorable to sustaining the trial court's judgment. *Cimarron Foothills Cmty. Ass'n v. Kippen*, 206 Ariz. 455, 457, ¶ 2, 79 P.3d 1214, 1216 (App. 2003).  "We will not set aside the [trial] court's findings of fact unless clearly erroneous, giving due regard to the opportunity of the court to judge the credibility of witnesses." *In re Estate of Zaritsky*, 198 Ariz. 599, 601, ¶ 5, 12 P.3d 1203, 1205 (App. 2000).  "A finding of fact is not clearly erroneous if substantial evidence supports it, even if substantial conflicting evidence exists." *Kocher v. Dep't of Revenue of State of Ariz.*, 206 Ariz. 480, 482, ¶ 9, 80 P.3d 287, 289 (App. 2003).  We review *de novo* the trial court's legal conclusions, as well as its findings regarding mixed questions of law and fact. *Pueblo Santa Fe Townhomes Owners' Ass'n v. Transcontinental Ins. Co.*, 218 Ariz. 13, 19, ¶ 19, 178 P.3d 485, 491 (App. 2008).

## I.     Equitable Estoppel

**¶7**     Appellants contend the trial court erred when it determined that the guaranty was valid and enforceable against Appellants, and that "Wells Fargo is not [equitably] estopped from enforcing the [g]uaranty against [Appellants]."  Appellants argue the evidence supports their equitable estoppel defense because it establishes: (1) Wells Fargo agreed to a loan modification in February 2008; (2) potential financing was available to Appellants with another lender, Prudential Mortgage Capital Corporation ("Prudential") in early 2008; (3)  based upon Wells Fargo's agreement to modify their loan, Appellants decided to forego financing with Prudential; and (4) when Wells Fargo withdrew the agreement to modify the loan in July 2008, the commercial lending market had drastically changed, and financing was no longer available with Prudential.  As a result, Appellants assert that the actions of Wells Fargo "led to the inability of [Loop 76] to secure financing to address the construction loan," and "undeniably increased the risk that a claim on [Appellants'] guaranty would be asserted."

3

**¶8**        Equitable estoppel is an affirmative defense that "applies when the conduct of a party absolutely precludes the party from asserting rights which might have otherwise existed against another person who in good faith has relied upon the conduct and as a result of such reliance has changed his position for the worse." *Heltzel v. Mecham Pontiac*, 152 Ariz. 58, 61, 730 P.2d 235, 237 (1986); *see Gorman v. Pima Cnty.*, 230 Ariz. 506, 510, ¶ 20 n.4, 287 P.3d 800, 804 n.4 (App. 2012). The three elements of equitable estoppel are: "(1) the party to be estopped commits acts inconsistent with a position it later adopts; (2) reliance by the other party; and (3) injury to the latter resulting from the former's repudiation of its prior conduct." *Valencia Energy Co. v. Ariz. Dep't of Revenue*, 191 Ariz. 565, 576-77, ¶ 35, 959 P.2d 1256, 1267-68 (1998); *see Gorman*, 230 Ariz. at 510-11, ¶ 21, 287 P.3d at 804-05 (noting the three elements of an equitable estoppel defense). In establishing the second element of equitable estoppel, a party must show that its reliance was reasonable under the circumstances of the case. *Valencia*, 191 Ariz. at 577, ¶ 37, 959 P.2d 1268.

## A.  The Prudential Loan

**¶9**        Appellants argue the trial court erred when it determined that, "Prudential never agreed to issue a loan on the terms stated in the Prudential Loan Application." Based on our review of the record, we disagree.

**¶10**        In early 2008, Appellants attempted to obtain permanent financing for Loop 76 from Prudential to pay off the Wells Fargo loan. In January 2008, Appellant John Wright ("Wright"), in his capacity as managing member for Loop 76, executed a loan application with Prudential. The application stated, "[t]his Application does not constitute a commitment to lend by [Prudential]," and "[s]ubject to payment of the Application Deposit and Good Faith Deposit . . . full underwriting, due diligence review, and loan committee approval," Prudential would "consider issuing a loan commitment." The application contained a "No Material Adverse Change" provision, which provided that Prudential was under no obligation to close and fund the proposed loan if, in Prudential's sole discretion, a "material adverse change" occurred in the "financial, banking, loan syndication, securitization or capital markets."

**¶11**        To accept the terms listed in the application, Loop 76 was required to sign the application and return it to Prudential with payment of the "Application Deposit" and the "Good Faith Deposit" no later than January 11, 2008. The application expressly stated, "If an executed copy of this Application, together with the Application Deposit and Good Faith

Deposit, has not been timely received, this Application shall be null and void."

¶12        Wright returned the application, but did not submit the Good Faith Deposit; instead, Wright deleted that term from the application.   As a result, Prudential never processed Loop 76's application.  Prudential also declined to process Loop 76's application due to changing market conditions.

¶13        The record reflects that in late February 2008, Prudential submitted an alternative financing proposal to Appellants.   However, Appellants declined to pursue this alternative proposal because it would not have provided Loop 76 with sufficient funds to pay off the Wells Fargo loan.  Thus, by late February 2008, Appellants had been unable to obtain a loan commitment on behalf of Loop 76 from Prudential, and the proposed terms in the original application were no longer being considered by Prudential.

¶14        Accordingly, we conclude the record supports the trial court's finding that Prudential did not agree to offer Loop 76 a loan based on the terms of the January 2008 application.

## B.  The Proposed Wells Fargo Loan Modification

¶15        Appellants also contend the trial court erred when it determined that Wells Fargo and Loop 76 "never reached an agreement on the terms for a modification to the existing Loan that included either an increase to the principal balance or a long-term extension of the maturity date."

¶16        While Appellants were attempting to obtain a loan from Prudential, they also tried to obtain a modification of the Wells Fargo loan.  On February 6, 2008, a few days after the original loan matured, Brandon Cox from Wells Fargo met with Wright to discuss the terms of a possible loan modification/extension.  Cox was the representative from Wells Fargo who was responsible for handling the Loop 76 loan.

¶17        At trial, the parties disputed what occurred during the February 6, 2008 meeting between Cox and Wright.  According to Cox, the parties discussed potential terms for extending or modifying the loan, including the possibility of increasing the loan limit from approximately $4.5 million to $28 million.  The additional $4.5 million would be used to finish the second floor, or mezzanine section of one of the buildings, thereby making this section of the building available for leasing to office

tenants. Cox testified that he never agreed to obtain a new loan for Loop 76 during the meeting; rather, he only discussed the potential terms for an extension or modification of the existing loan. In summarizing the meeting, Cox testified that there were no promises or agreements, and that the proposed terms were "[o]bviously still subject to our internal approval and final document of the loan."

¶18 In contrast, Wright testified that when the February 6, 2008 meeting was concluded, he believed a loan modification agreement had been reached between Wells Fargo and Loop 76. As a result, Wright cancelled any pending financing with Prudential.

¶19 After the meeting concluded, Appellant Michael J. Herlihy e-mailed Cox and asked, "Have you been able to come up with terms for our semi perm loan? Can you tell us what to expect?" In response, Cox noted that he had met with Wright earlier that day and stated:

> I'm shooting for the following:
>
> Amount - $28,000,000 (I'm not sure I'll get more out of it, but I'll try)
>
> Rate - 30 day LIBOR + 2.00 floating (currently 5.25%). We will use a SWAP agreement to fix the rate on $24,000,000 matching the maturity at around 5%.
>
> Term - 24 month (Again, I'm not sure I'll get more but I'll try)
>
> Fee - .50% ($140,000)
>
> Recourse - stays the same
>
> I will keep you posted of my progress. If you have any questions or comments, please don't hesitate to contact me.

¶20 Wright testified that from February 2008 through June 2008, Cox continued to assure him that Wells Fargo was attempting to finalize the loan modification based on the terms the parties had agreed to on February 6.

¶21 In contrast, Cox testified that he never provided any assurances regarding the proposed loan modification during this time period. Rather, on February 29, 2008, Herlihy sent Cox an email expressing the desire of Loop 76 and Appellants to alter the proposed loan modification terms. Specifically, Herlihy proposed a decrease in

additional funding from $4.5 million (total $28 million) to $2.5 million (total $26 million). Herlihy stated that Loop 76 now intended to use "private funds" to finish construction on the mezzanine section of the building instead of additional loan funds from Wells Fargo. Cox responded that the "benefit" of the original proposal for an additional $4.5 million loan modification was to "stabilize the property" and finish the mezzanine floor so that it would be available for leasing to tenants, and not simply to provide Loop 76 with additional cash. Cox concluded his email by stating, "I don't understand the change of heart . . . ."

¶22    Following this email exchange, in March 2008 Wright informed Cox that he was being sued in California and faced a potential judgment of $5.9 million. While Appellants assert that Cox knew or should have known about this lawsuit prior to March 2008, Cox testified that the discovery of Wright's potential liability from the California lawsuit concerned Wells Fargo, because "such a judgment was well in excess of any cash that [Wright] would have maintained on his personal financial statement."

¶23    On July 2, 2008, Herlihy sent an email to Cox inquiring about the status of the Wells Fargo loan modification. In response, Cox advised Herlihy that he was only focused on a possible extension of the maturity date for the current loan, and it was not likely Wells Fargo was going to agree to a modification that increased the loan limit. Based on this email, Appellants understood, purportedly for the first time, that Wells Fargo was not going to modify Loop 76's loan.

¶24    Based on our review of the record, we conclude there is substantial evidence to support the trial court's finding that Wells Fargo and Loop 76 never reached an agreement on a loan modification. While the testimony of Cox and Wright concerning the February 6, 2008 meeting is conflicting, we defer, as we must, to the trial court's determination that the testimony of Cox was more credible. *Imperial/Litho Graphics v. M.J. Enters.*, 152 Ariz. 68, 72, 730 P.2d 245, 249 (App. 1986) (stating that it is the province of the trial judge, and not the appellate court, to determine the credibility of witnesses).

¶25    The February 6, 2008 email supports the trial court's conclusion. The email does not, as Appellants contend, establish that Loop 76 and Wells Fargo had reached an agreement on the terms of a loan modification. Cox's statements that he is "shooting for the following," "I'm not sure I'll get more," and "I'll keep you posted on my progress" is not an agreement. These statements indicate that (1) Cox was reciting the

proposed terms the parties had discussed at their earlier meeting, and (2) Cox was going to present those terms for consideration by Wells Fargo.

¶26 Finally, there is substantial evidence in the record showing that Cox did not induce Appellants to believe Wells Fargo had agreed to a modification during the period between February 2008 and July 2008. To the contrary, Cox expressed his concerns about two material changes that potentially prevented the parties from reaching an agreement. When notified of Appellants' alternative financing proposal in late February 2008, Cox stated "I don't understand the change of heart," and noted that Appellants' proposal jeopardized the primary purpose of the loan modification; to provide sufficient funds to finish the construction project. In addition, in March 2008, Cox advised Wright that Wells Fargo was concerned about Wright's liability in his pending California lawsuit.

¶27 Appellants assert that we should disregard the trial court's credibility determinations because the trial judge was biased against them. This argument is presented for the first time on appeal, and we do not, as a general matter, consider issues unless they were raised in the trial court. *Englert v. Carondelet Health Network,* 199 Ariz. 21, 26, ¶ 13, 13 P.3d 763, 768–69 (App. 2000).

¶28 Moreover, a party challenging a trial judge's impartiality must overcome the presumption that trial judges are free of bias and prejudice and must set forth "a specific basis for the claim of partiality and prove by a preponderance of the evidence that the judge is biased or prejudiced." *Simon v. Maricopa Med. Ctr.*, 225 Ariz. 55, 63, ¶ 29, 234 P.3d 623, 631 (App. 2010) (internal citations omitted). The bias and/or prejudice necessary for disqualification "generally must arise from an extra-judicial source and not from what the judge has done in his participation in the case." *Id.* Here, Appellants' late claim of judicial bias fails because they have not presented any facts establishing any source of bias.

¶29 Accordingly, we affirm the trial court's judgment (1) determining that Wells Fargo was not equitably estopped from enforcing the guaranty, and (2) finding Appellants liable under the guaranty for the indebtedness incurred by Loop 76 under the loan.

## II. Damages

¶30 Appellants contend the trial court erred in its award of damages. Appellants argue that Wells Fargo failed to present sufficient evidence to support the damages set forth in the trial court's judgment.

¶31         We review a trial court's calculation of damages for an abuse of discretion. *Gonzales v. Ariz. Pub. Serv. Co.*, 161 Ariz. 84, 90, 775 P.2d 1148, 1154 (App. 1989). Once the fact of damages has been proved, a plaintiff must establish the amount of his damages with a reasonable certainty. *Cnty. of La Paz v. Yakima Compost Co., Inc.*, 224 Ariz. 590, 607, ¶ 53, 233 P.3d 1169, 1186 (App. 2010). A "plaintiff's evidence [should] provide some basis for estimating his loss," and "conjecture or speculation cannot provide the basis for an award of damages." *Gilmore v. Cohen*, 95 Ariz. 34, 36, 386 P.2d 81, 82 (1963) (internal citations omitted); *see Cnty. of La Paz*, 224 Ariz. at 607, ¶ 53, 233 P.3d at 1186. The terms of an agreement may provide the basis for calculating a party's damages. *See Paul R. Peterson Constr., Inc. v. Ariz. State Carpenters Health and Welfare Trust*, 179 Ariz. 474, 485, 880 P.2d 694, 705 (App. 1984) (holding that calculation of prejudgment interest may be based on the terms of a contract between the parties).

¶32         As an initial matter, Wells Fargo claims Appellants waived any challenge to the damages award by not previously filing a motion for new trial. *See Tucson Gas & Elec. Co. v. Larsen*, 19 Ariz. App. 266, 268, 506 P.2d 657, 659 (1973). We disagree. Because this case was decided by a judge and not a jury, the issue is properly before us. *S & R Properties v. Maricopa Cnty.*, 178 Ariz. 491, 504, 875 P.2d 150, 163 (App. 1993).

## A. Cox's Testimony

¶33         Cox testified as Wells Fargo's primary witness concerning the amount of Wells Fargo's damages. Appellants objected to Cox's testimony, claiming that Cox lacked the requisite knowledge to testify about the reasonableness or necessity of any fees or costs incurred by Loop 76 under the loan. The trial court overruled Appellants' objection. Appellants argue the trial court's ruling was reversible error.

¶34         This court "will affirm the trial court's rulings on the exclusion or admission of evidence absent an abuse of discretion or legal error and prejudice." *Brown v. United States Fid. & Guar. Co.*, 194 Ariz. 85, 88, ¶ 7, 977 P.2d 807, 810 (App. 1998); *see Waddell v. Titan Ins. Co.*, 207 Ariz. 529, 536, ¶ 28, 88 P.3d 1141, 1148 (App. 2004) (holding that a trial court's evidentiary rulings are reviewed for an abuse of discretion).

¶35         We find no error. The record reflects that Cox had sufficient personal knowledge to testify about Wells Fargo's damages. Cox testified that he was the Wells Fargo employee assigned to handle the Loop 76 loan. Cox also described the steps he took to determine the fees and costs

paid by Wells Fargo to third party consultants such as appraisers, environmental consultants, and property inspectors.

### B. Principal and Interest

**¶36** The trial court awarded Wells Fargo $23,622,423.82 in damages for the unpaid principal balance of the loan. This award was based upon the testimony of Cox, as well as the note, construction loan agreement, guaranty, and all of the loan documents. In addition, Wells Fargo representative Sam Supple testified to a similar principal balance of $23.1 million. Finally, Wright conceded during his testimony that Wells Fargo claimed an outstanding principal balance of $23,622,000, but Wright believed the principal owed to Wells Fargo was $23,604,000.

**¶37** Despite some minor conflicts in the testimony, we conclude there is sufficient evidence to support the trial court's damage award of $23,622,423.82 for unpaid principal.

**¶38** The trial court also awarded Wells Fargo accrued interest on the principal sum of the loan in the amount of $6,861,630.88. This interest was calculated at the rate of 8.25% per annum from January 1, 2009 to December 3, 2012. This calculation is based on the default interest rate set forth in the note, which was introduced as an exhibit at trial, and the testimony of Cox. Based on this evidence, the record supports the trial court's (1) award of accrued interest on the loan, and (2) its method of calculating accrued interest on the loan.

**¶39** However, for the reasons discussed below, we conclude the trial court erred when it failed to reduce either the principal or accrued interest on the loan by the amount of Loop 76's bankruptcy payments. *See supra*, at pgs. 12-13. As a result, we vacate the principal and interest awards in the judgment, and remand this matter to the trial court to determine the amount the loan principal and/or interest may have been reduced by Loop 76's bankruptcy payments.

### C. Fees and Costs

**¶40** The trial court awarded Wells Fargo $62,838.67 for "fees and costs" in its judgment. Based on the parties' briefs, this damage award appears to consist of fees and costs that were incurred in connection with Loop 76's bankruptcy proceeding. However, subsequent to the filing of the briefs in this case, Wells Fargo conceded that the trial court incorrectly

awarded this item of damages.[2]   We therefore vacate this amount of damages from the trial court's judgment.

**¶41**        The trial court also awarded Wells Fargo damages for "other loan fees and costs" in the amount of $7,474.00.  In their briefs, Appellants do not specifically address this item of damages.  As a result, Appellants have waived any objection to this award of damages, and we therefore affirm the trial court's judgment as to this amount of damages.  *DeElena v. S. Pac. Co.*, 121 Ariz. 563, 572, 592 P.2d 759, 768 (1979) (holding that issues which are not clearly raised and argued by a party in his appellate brief are waived); *Belen Loan Investors, LLC v. Bradley*, 231 Ariz. 448, 457, ¶ 22, 296 P.3d 984, 993 (App. 2012) (same).

### D.  Bankruptcy Payments

**¶42**        Appellants also assert the trial court erred by failing to reduce the amount of the judgment by $3,525,644.57, the amount Loop 76 paid to Wells Fargo through its Chapter 11 reorganization plan as of December 2012.  Wells Fargo admitted that, pursuant to the bankruptcy reorganization plan, Loop 76 had been paying Wells Fargo about $115,000.00 per month in principal and interest.  At the time of trial, Wells Fargo was holding Loop 76's payments in a "suspense account"; however, after the judgment was entered, Wells Fargo applied the payments to the judgment.

**¶43**        "A guarantee is a contract secondary or collateral to the principal contractual obligation it guarantees."  *Phx. Arbor Plaza, Ltd. v. Dauderman*, 163 Ariz. 27, 29, 785 P.2d 1215, 1217 (App. 1989).  Thus, as a general matter, discharge or payment of a principal debtor's obligation to a creditor also discharges or reduces the obligation of a guarantor. *Howard v. Associated Grocers*, 123 Ariz. 593, 595, 601 P.2d 593, 595 (1979); *Giovanelli v. First Fed. Sav. and Loan Ass'n of Phx.*, 120 Ariz. 577, 582, 587 P.2d 763, 768 (App. 1978).  *See* Restatement (Third) of Suretyship & Guaranty § 19(a), Cmt. a (1996) ("To the extent that the underlying

---

[2]     Wells Fargo determined that this award of "fees and costs" awarded in the judgment consists of late fees Wells Fargo had previously demanded in its correspondence with Appellants, but subsequently determined had been calculated incorrectly.  As a result, Wells Fargo was no longer seeking an award of these fees and costs at the time of trial.

obligation is discharged by performance or other satisfaction by the principal obligor, the secondary obligation is also discharged.").

¶44        Here, the guaranty limits Appellants' liability to the "indebtedness" incurred by Loop 76 under the loan. This indebtedness is, in turn, the basis for the judgment against Appellants. Appellants are therefore entitled to a reduction of their obligation as guarantor of the loan in the amounts Loop 76 paid to Wells Fargo through the bankruptcy proceedings.

¶45        Wells Fargo argues that the judgment should not be reduced by the amount of Loop 76's bankruptcy payments because: (1) at the time the judgment was entered, the payments ordered under the bankruptcy reorganization plan had been appealed by Wells Fargo and were subject to change; (2) the bankruptcy code prevented Wells Fargo from obtaining a double recovery from both Loop 76 and Appellants; and (3) the payments made by Loop 76 only affected the amount of money Wells Fargo could collect from Appellants, not the amount of the judgment against Appellants.

¶46        We disagree. If Loop 76's bankruptcy payments had been applied by Wells Fargo to the loan, the payments may have reduced the amount of principal and/or accrued interest ultimately awarded to Wells Fargo in the judgment. Wells Fargo's delay in applying these payments appears to have inured to its benefit by increasing the amount of the judgment.

¶47        Accordingly, we conclude the trial court reversibly erred by failing to reduce Wells Fargo's damages award by the amounts paid by Loop 76 to Wells Fargo in connection with Loop 76's bankruptcy proceedings.

### III.    Written Demand

¶48        Finally, Appellants contend the trial court erred when it determined that Wells Fargo had sent a proper written demand for payment after Loop 76 defaulted on the loan. Appellants argue that Wells Fargo failed to present sufficient admissible evidence establishing that it provided proper written notice of default and demand for payment as required by the guaranty.

### A. Notice Required by the Guaranty

**¶49**        Under the terms of the guaranty, Wells Fargo was required to provide a five-day written notice to Appellants before it could demand payment and seek to obtain a "judgment" for damages connected with the loan.   Section 5.9 of the guaranty required that all notices be sent to Appellants on the addresses shown on the signature pages.  The signature page signed by the Wrights reflected their address as "10800 E. Cactus Road, #59, Scottsdale, Arizona"; the signature page for the Herlihys and the Herlihy Trust reflected their address as "415 9th Street, Coronado, CA, 92118."

### B. Admissibility of the Demand Letters

**¶50**        Appellants assert the trial court erred by allowing Wells Fargo, on the final day of trial, to admit into evidence the demand letters sent to Appellants.  Attached to each letter was a certified mail receipt. Appellants contend the letters should have been precluded because they were not listed as exhibits by Wells Fargo in the joint pretrial statement. *See* Ariz. R. Civ. P. 16(d)(2)(E) (stating that exhibits not listed in the parties' joint pretrial statement may be precluded "except for good cause shown").  Appellants argue that the trial court reversibly erred when it admitted the letters over their objection.  We review the trial court's evidentiary ruling on this issue for an abuse of discretion.  *Waddell*, 207 Ariz. at 536, ¶ 28, 88 P.3d at 1148.

**¶51**        Before trial, the parties submitted a joint pretrial statement containing the following stipulation: "Notwithstanding Wells Fargo's **demand for payment**, [Appellants] have not paid Wells Fargo any amounts owed by [Loop 76] to Wells Fargo under the Loan Documents." (Emphasis added.)  When Appellants objected to admission of the letters, Wells Fargo explained that, relying on the stipulation in the joint pretrial statement, it did not list the letters as exhibits because it had assumed Appellants did not dispute receiving a demand letter.

**¶52**        The court overruled Appellants' objection and admitted the letters into evidence.  The court stated that it was reasonable for Wells Fargo to assume that Appellants did not contest receiving the demand letters based on the stipulation in the joint pretrial statement.  In addition,

the court noted that Wells Fargo had already introduced testimony stating that the demand letters had been sent to Appellants.[3]

**¶53**      Our review of the record shows no abuse of discretion. The trial court properly considered the reasons for Wells Fargo's failure to list the letters in the joint pretrial statement, as well as the prejudicial effect, if any, the admission of the letters would have on Appellants.

### C.  Sufficiency of the Evidence

**¶54**      Appellants contend that even with the admission of the demand letters, Wells Fargo has not proved it complied with the notice requirements of the guaranty because it failed to show that Appellants received the letters prior to the filing of Wells Fargo's lawsuit.

**¶55**      "[T]here is a strong presumption that a letter properly addressed, stamped and deposited in the United States mail will reach the addressee." *State v. Mays*, 96 Ariz. 366, 367-68, 395 P.2d 719, 721 (1964); *see Andrews v. Blake*, 205 Ariz. 236, 243, ¶ 22 n.3, 69 P.3d 7, 14 n.3 (2003). "The presumption is rebutted, however, when the addressee denies receipt" of the letter. *Blake*, 205 Ariz. at 243, ¶ 22 n.3, 69 P.3d at 14 n.3. As a result, the issues concerning the mailing and receipt of Wells Fargo's letters were a question of fact that had to be determined by the trial court. *Id.* "We will not set aside the [trial] court's findings of fact unless clearly erroneous, giving due regard to the opportunity of the court to judge the credibility of witnesses." *Zaritsky*, 198 Ariz. at 601, ¶ 5, 12 P.3d at 1205.

**¶56**      The record shows that Appellants received the demand letters. Wells Fargo mailed written notices/demand letters to Appellants on August 21, 2009, approximately two weeks before Wells Fargo filed its lawsuit. In addition, the demand letters were sent to the addresses Appellants listed as their mailing addresses in the guaranty.

**¶57**      The mail receipt attached to the Herlihys' letter is date stamped August 21, 2009, and was signed for by Appellant Marguerite Herlihy on August 25, 2009 at the address identified by the Herlihys in the guaranty. At trial, Mr. Herlihy confirmed that the signature on the mail receipt is his wife's signature.

---

[3]      Sam Supple, a representative for Wells Fargo, testified that he had sent separate demand letters to Loop 76 and Appellants on September 22, 2008.

¶58 The mail receipt attached to the Wrights' letter also shows that it was sent to the Wrights on August 21, 2009, at the address listed in the guaranty. However, the letter addressed to the Wrights was returned as undeliverable. Wells Fargo located an alternate address for the Wrights and sent a second demand letter (enclosing the original August 21 letter) to them on September 14, 2009. John Wright initially denied living at the address to which the September 14 letter was sent; however, he ultimately confirmed that his wife's signature appeared on the mail receipt attached to the letter.

¶59 Accordingly, we affirm the trial court's determination that Wells Fargo sent a written demand to Appellants as required by the guaranty.

## IV.     Attorney's Fees

¶60 Both parties request an award of attorney's fees incurred on appeal pursuant to A.R.S. § 12-341.01(A). Because both parties have lost on some issues and prevailed on other issues on appeal, we deny the parties' requests for discretionary attorney's fees under A.R.S. § 12-341.01(A). A.R.S. § 12-341.01(A) (stating an award of fees is discretionary; "the court *may* award the successful party" fees) (emphasis added); *Fulton Homes Corp. v. BBP Concrete*, 214 Ariz. 566, 569, ¶ 10, 155 P.3d 1090, 1093 (App. 2007) (stating that one of the factors a court should consider in awarding fees under A.R.S. § 12-341.01 is "whether the successful party did not prevail with respect to all of the relief sought") (internal citations omitted).

¶61 However, Wells Fargo also seeks attorney's fees pursuant to the guaranty, which provides that Appellants "promise to pay" "reasonable attorneys' fees and court cost incurred" by Wells Fargo "to enforce its rights under this [g]uaranty." Based on the fee provision in the guaranty, an award of reasonable fees in favor of Wells Fargo is mandatory. *Geller v. Lesk*, 230 Ariz. 624, 627, ¶ 10, 285 P.3d 972, 975 (App. 2012). We therefore direct Wells Fargo to submit a fee application in compliance with Arizona Rule of Civil Appellate Procedure 21(C).

## Conclusion

¶62      For the aforementioned reasons, we affirm the judgment in part, vacate it in part, and remand this matter to the trial court for further proceedings consistent with this decision.



Ruth A. Willingham · Clerk of the Court
FILED: gsh