NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA ex rel. HENRY R. DARWIN, Director, Arizona
Department of Environmental Quality, *Plaintiff/Appellee*,

*v.*

FISHER SAND & GRAVEL CO., a North Dakota corporation,
*Defendant/Appellant*.

No. 1 CA-CV 13-0608
FILED 3-3-2015

Appeal from the Superior Court in Maricopa County
No. CV2011-007962
The Honorable Sally Schneider Duncan, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By James T. Skardon
*Counsel for Plaintiff/Appellee*

Ryley Carlock & Applewhite, PA, Phoenix
By John C. Lemaster, Albert H. Acken, Samuel L. Lofland
*Counsel for Defendant/Appellant*

---

## MEMORANDUM DECISION

Judge Kenton D. Jones delivered the decision of the Court, in which Presiding Judge Peter B. Swann joined. Judge Michael J. Brown specially concurred in part and dissented in part.

---

**J O N E S**, Judge:

¶1          Fisher Sand & Gravel Company (Fisher) appeals from a judgment awarding the Arizona Department of Environmental Quality (ADEQ) stipulated monetary penalties after finding Fisher violated a consent judgment previously entered into with ADEQ prohibiting further violation of air pollution statutes and regulations. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2          Fisher, a North Dakota corporation, produces road-building materials at its hot mix asphalt and crushing and screening plants located in Gila Bend, Glendale, and Peoria, Arizona.

¶3          In April 2011, ADEQ filed suit against Fisher pursuant to Arizona Revised Statutes (A.R.S.) sections 49-262,[1] -462, and -463, alleging numerous violations of state air and water pollution statutes and regulations. The litigation resolved with a settlement and entry of a Consent Judgment requiring Fisher to pay $125,000 in civil penalties. The Consent Judgment also provided:

> If [Fisher], or any entity owned, controlled or managed by [Fisher], commits civil violations of A.R.S. Title 49, Chapter 3, Article 2 [A.R.S. §§ 49-421 to -467], rules adopted thereunder, or air quality permits issued thereunder at any time during the next two (2) years, commencing on [April 25, 2011], [ADEQ] in its sole discretion, shall have the option of either collecting stipulated penalties pursuant to this section, or pursuing statutory penalties.

---

[1]          Absent material revisions from the relevant date, we cite to the current version of a statute or regulation unless otherwise indicated.

The Consent Judgment further afforded ADEQ the ability to "enter any property of [Fisher] at any location" for the purpose of ensuring compliance, as well as the "right to take enforcement action for any and all violations of [the] Consent Judgment . . . and pursue all legal and equitable remedies."

¶4          Just before the expiration of the two-year period, ADEQ obtained an order to show cause for Fisher's alleged failure to comply with the Consent Judgment and moved for the assessment of additional penalties against Fisher following inspections of its portable crushing and screening plants and hot mix asphalt plants.  ADEQ alleged Fisher had committed three violations of Arizona's air quality and permitting laws by: (1) operating two pieces of equipment for one day without an appropriate permit at its Peoria plant, in violation of A.R.S. § 49-426(A)(2) and Arizona Administrative Code (A.A.C.) R18-2-302(A); (2) creating a new, single stationary source by co-locating an ADEQ permitted portable source with a Maricopa County permitted stationary source, and operating this new source for 355 days without obtaining a new permit; and (3) failing to conduct required pollution tests.[2]  Although these violations could have resulted in stipulated damages pursuant to the Consent Judgment totaling $2,409,000, ADEQ sought recovery of only $500,000.

¶5          After briefing and oral argument, the trial court found in favor of ADEQ on each claim and imposed the requested $500,000 penalty.  Fisher timely appealed.  We have jurisdiction pursuant to A.R.S. § 12-2101(A)(1).

## DISCUSSION

### I.     Standard of Review

¶6          We review the trial court's interpretation of regulations and statutes, and its application of the law to the facts, *de novo*.  *Sedona Grand, L.L.C. v. City of Sedona*, 229 Ariz. 37, 40, ¶ 8, 270 P.3d 864, 867 (App. 2012).  We apply the same principles of construction when interpreting regulations as we do when construing statutes.  *DaimlerChrysler Servs. N. Am., L.L.C. v. Ariz. Dep't of Revenue*, 210 Ariz. 297, 301, ¶ 12, 110 P.3d 1031, 1035 (App. 2005).  Because neither party requested findings of fact or conclusions of law pursuant to Arizona Rule of Civil Procedure 52(a), we "'presume the trial court found every fact necessary to support its judgment and will

---

[2]     Fisher does not challenge $11,000 in penalties awarded to ADEQ for testing violations.

affirm if any reasonable construction of the evidence justifies it.'" *Canyon Ambulatory Surgery Ctr. v. SCF Ariz.*, 225 Ariz. 414, 422, ¶ 28, 239 P.3d 733, 741 (App. 2010) (quoting *Garden Lakes Cmty. Ass'n, Inc. v. Madigan*, 204 Ariz. 238, 240, ¶ 9, 62 P.3d 983, 985 (App. 2003)).

## II.    The Statutory and Regulatory Framework

¶7        Arizona's statutory scheme addressing air pollution is aimed at "control[ling] present and future sources of emission of air contaminants" by regulating "every type" of air polluting activity in an effort to "insure[] the health, safety and general welfare of all the citizens of the state . . . protect[] property values and protect[] plant and animal life." A.R.S. § 49-401(A).    To effectuate this purpose, the legislature placed "primary responsibility for air pollution control and abatement in [ADEQ]" and reserved to the individual counties "the right to control local air pollution problems as specifically provided [by statute]." *Id.*

¶8        As pertinent here, both stationary and portable pollution sources are subject to that scheme.  A stationary source is "any facility, building, equipment, device or machine that operates at a fixed location and that emits or generates air contaminants."    A.R.S. § 49-401.01(36).    A portable source is "any stationary source that is capable of being transported and operated in more than one county of this state."  A.R.S. § 49-401.01(30).

¶9        ADEQ has original jurisdiction over sources, permits, and violations relating to, among other activities, "[a]ir pollution by portable sources."  A.R.S. § 49-402(A)(6).  For all other sources not listed within § 49-402(A), "the review, issuance, administration and enforcement of permits issued under [A.R.S. Title 49, Chapter 3] shall be by the county or multi-county air quality control region" unless ADEQ specifically asserts jurisdiction over a source through written notice to the county.  A.R.S. § 49-402(B).

¶10        Under this statutory arrangement, and with limited exception, in order for an emission source to be constructed or operated, the operator must first apply for and obtain a permit from either ADEQ or the appropriate county agency.  *See* A.R.S. § 49-426(A)(2) (state permit requirement); A.R.S. § 49-480(C) (county permit requirement).  An operator may obtain either an individual permit for each source, or, if appropriate, an Authorization to Operate (ATO) pursuant to a general permit promulgated by ADEQ or the county.  A.R.S. § 49-426(A)(2), (H); A.R.S. § 49-480(C), (J); A.A.C. R18-2-503(A).

### III.    Co-Location of Fisher's Portable Source with Its County Permitted Stationary Source Created a New, Unpermitted Stationary Source.

#### A.    Background of Alleged Violation

¶11        In May 2010, in accordance with a 2010 Hot Mix Asphalt Plant General Permit, Fisher obtained, from ADEQ, an ATO for its portable hot mix asphalt plant (the portable source).  Pursuant to the ATO, Fisher was able to operate the portable source in any county in Arizona.  Fisher originally operated the portable source in Gila Bend, Arizona.

¶12        In April 2011, Fisher filed a Notice of Equipment Transfer (Notice) with ADEQ as required by A.A.C. R18-2-324(D), stating its intent to relocate the portable source to an address in El Mirage, Arizona and identifying the equipment permitted under the ATO.  Fisher did not volunteer that the new location was adjacent to an existent hot mix asphalt plant (the Maricopa source), which Fisher operated pursuant to a separate county issued air quality permit.  Fisher thereafter relocated the portable source to its El Mirage facility and operated both sources at this location.

¶13        In its petition for order to show cause, ADEQ alleged the co-located portable and Maricopa sources created a single new "stationary source" under A.A.C. R18-2-101(139), which provides in relevant part:

> "Stationary source" means any building, structure, facility or installation subject to regulation pursuant to A.R.S. § 49-426(A) which emits or may emit any air pollutant. "Building," "structure," "facility," or "installation" means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person or persons under common control.

ADEQ argued the information provided to obtain the previous ATO was not germane to the newly constructed El Mirage facility's operation, and Fisher violated A.R.S. § 49-426(A)(2) by operating the new stationary source without obtaining a new permit.  ADEQ acknowledged that had Fisher obtained such a permit, it could have legally operated the co-located plant.

¶14        Fisher disputes the imposition of penalties for this alleged violation, arguing (1) it had valid, albeit separate, permits for each of the individual hot mix asphalt plants co-located at the El Mirage facility; (2) Fisher was not required to obtain a new permit from ADEQ for co-locating its portable and stationary sources; (3) ADEQ lacks permitting and

enforcement authority over the co-located El Mirage facility; (4) ADEQ is estopped from seeking penalties because it did not object following notification of the portable source's relocation to El Mirage; (5) this action is an unauthorized "collateral attack" on Fisher's ADEQ permit; and (6) the imposition of penalties violated Fisher's right to due process. We address each argument in turn.

### B. Fisher Operated the Newly Created Source Without a Permit in Violation of State Law.

¶15 Fisher argues the trial court erred in finding it operated the co-located plants without a permit because, according to Fisher, it "in fact had a permit for each asphalt plant." Fisher contends that the combination of its county permit authorizing operation of the Maricopa source, its ATO under ADEQ's general permit authorizing operation of its portable source, and its Notice regarding relocation of the portable source satisfied any permitting obligations after co-location. We disagree.

¶16 Fisher's own permitting expert admitted the co-location of the two separately permitted plants could be considered creation of a single stationary source. We interpret this concession to mean the addition of the portable source to the Maricopa source created a new stationary source, as contemplated by the regulatory scheme. *See* A.A.C. R18-2-101(139); *see also Citizens for Clean Air & Water in Pueblo & S. Colo. v. Colo. Dep't of Pub. Health & Env't*, 181 P.3d 393, 396-97 (Colo. App. 2008) (affirming agency determination that an entity's placement of a new unit next to an original stationary source created a new single stationary source). Because the co-location created one new stationary source, Fisher was required to obtain a permit for this new source. *See* A.R.S. § 49-426(A)(2) (requiring a permit before construction or operation of "any source"); A.A.C. R18-2-302(A) (2011) ("[N]o person shall commence construction of, operate, or make a modification to any source . . . without obtaining a permit or permit revision . . . ."). Fisher did not obtain a new permit, nor did it even seek a permit revision, and thus operated the source in violation of state law.[3]

---

[3] Fisher also asserts the trial court construed A.A.C. R18-2-101(139) and R18-2-302(A) in a manner more restrictive than authorized by federal law. Because Fisher failed to raise this argument at the trial court or in its Opening Brief, we decline to address it. *See Lemons v. Showcase Motors, Inc.*, 207 Ariz. 537, 541 n.1, ¶ 17, 88 P.3d 1149, 1153 n.1 (App. 2004) (declining to reach legal issues and arguments raised for the first time on appeal);

¶17        We find unpersuasive Fisher's argument that the newly created source was properly permitted because each of its component plants was operating under a separate active permit. Under A.A.C. R18-2-302(A) (2011), a person is prohibited from "commenc[ing] construction of, operat[ing], or mak[ing] a modification to any source subject to regulation under this Article, without obtaining a permit or permit revision from [ADEQ]."[4] Fisher argues the statutory and regulatory definition of the word "commence" demonstrates a source may be operated pursuant to multiple permits. Fisher relies on the applicable statute and administrative code defining "commence" as it relates to the construction of a source, to mean "that the owner or operator has obtained all necessary preconstruction approval or *permits* required by federal law and this chapter . . . ." A.R.S. § 49-401.01(10)(a) (emphasis added); *see also* A.A.C. R18-2-101(31) (similarly defining commence).

¶18        We decline to read the use of the plural "permits" as demonstrating a single, new source may operate based upon the combination of two separate sources, each remaining reliant upon individual permits, issued by separate state and county agencies. This statute does not indicate that a single source may be "permitted" through the piecemeal permitting of the individual component parts which, in the aggregate, comprise the single source, with those various permits issued by different state and county authorities and without regard to the combined effect of increased emissions from "all of the pollutant-emitting activities which . . . are located on one or more contiguous or adjacent properties, and are under the control of the same person." A.A.C. R18-2-101(139). Rather, the language of the statute and regulation merely recognizes that there may be instances in which multiple permits may be required pursuant to federal and state law for a single source. *See Mathews ex rel. Mathews v. Life Care Ctrs. of Am., Inc.*, 217 Ariz. 606, 608, ¶ 6, 177 P.3d 867, 869 (App. 2008) (noting the primary goal of statutory interpretation is to give effect to legislative

---

*Wasserman v. Low*, 143 Ariz. 4, 9 n.4, 691 P.2d 716, 721 n.4 (App. 1984) ("An issue first raised in a reply brief will not be considered on appeal.") (citations omitted).

[4]        The rule was amended in 2012. The current version of A.A.C. R18-2-302(A) provides: "Except as otherwise provided in this Article, no person shall begin actual construction of, operate, or make a modification to any stationary source subject to regulation under this Article, without obtaining a registration, permit or permit revision from the Director."

intent, and the "plain language of the statute [i]s the best indicator of that intent.") (citations omitted).

¶19        To allow a single source to come into existence through the aggregation of equipment, previously issued permits, and involvement of multiple permit-issuing agencies would undermine the intent behind the air quality regulatory scheme, as expressly stated by the legislature:

> [T]o exercise the police power of this state in a coordinated state-wide program to control present and future sources of emission of air contaminants to the end that air polluting activities of every type shall be regulated in a manner that insures the health, safety and general welfare of all the citizens of the state; protects property values and protects plants and animal life.

A.R.S. § 49-401.   Consistent with this purpose, the regulatory scheme contemplates an ability to reassess a source's potential for emissions where changes to a facility are made, even if a new permit is not required.  *See* A.A.C. R18-2-317(D) (requiring advance notice to ADEQ of changes to a facility with a Class I permit even if the change would not require a permit revision); A.A.C. R18-2-317.02(C) (2011) (requiring advance notice be given to ADEQ if a change to a Class II permitted source will be significant); A.A.C. R18-2-503(A)(1) (requiring an ATO applicant to provide "[i]nformation identifying and describing the source, its processes, and operating conditions in sufficient detail to allow [ADEQ] to determine qualification for, and to assure compliance with, the [existing] general permit").  The burden is on the applicant to provide sufficient information regarding equipment and activities such that the regulatory body can make an informed decision that the requested activities would not be harmful to the general welfare of state citizens or the environment.  *See* A.R.S. § 49-426(C) (requiring a permit application to "contain all the information necessary to enable [ADEQ] to make the determination to grant or deny such application"); A.R.S. § 49-427(A) (granting ADEQ authority to deny a permit or permit revision if the applicant fails to show a source is designed, controlled or equipped to operate without violating air pollution statutes and regulations).

¶20        Adopting Fisher's position would deprive a single permitting authority the opportunity to make a global assessment of the potential emissions of a new and larger source, simply because it resulted from the combination of two separately permitted sources that have been co-located at the direction of a single operator.  It would further permit sophisticated

operators to legally construct a major source through the combination of separately permitted minor sources while avoiding the conditions and limitations normally applicable to major sources during these processes. *See* A.A.C. R18-2-402. Fisher acknowledges such a result could occur if we were to accept his position.

¶21 Here, Fisher's original ATO was issued by ADEQ based upon the portable source equipment disclosed *prior* to the co-location; the same is presumably true for the Maricopa source.[5] Therefore, neither the ATO nor the Maricopa County permit accurately reflected the total pollution capability of the equipment currently located at the El Mirage facility, and consequently, we cannot conclude either ADEQ or Maricopa County ever authorized its operation based upon an accurate assessment of its current emission potential. It does not matter whether the new source Fisher created has ever exceeded the emissions limitations of the prior permits or that the two co-located sources are not alleged to constitute a major source; by failing to obtain a permit for the new stationary source, or even seek a permit revision, Fisher deprived ADEQ and Maricopa County of the information necessary to "control present and future sources of emission of air contaminants," and was able to contravene the stated purpose of the regulatory scheme. *See State v. Associated Metals & Minerals Corp.*, 635 S.W.2d 407, 410 (Tex. 1982) (holding that a change in the method of operation required a new permit from the state agency, and that agency, not the courts, should determine whether a given change will result in an increase in air contaminants).

¶22 We therefore reject Fisher's interpretation of the relevant regulations, as to do otherwise would lead to absurd results running contrary to the purpose of the statutory and regulatory pollution scheme. Accordingly, although Fisher controlled two properly permitted, individual plants, once Fisher decided to combine those plants and created a new source, potentially increasing emissions, a new permit was required.

¶23 We find further support for this conclusion in the statutory prohibition of permit transfers from one source to another. A.R.S. § 49-429(A) ("A permit shall not be transferable, whether by operation of law or otherwise, either from one location to another or from one source to another."). Although the statute provides an exception for portable sources to be transferred from one location to another, it does not contain a similar

---

[5] The Maricopa County permit for the Maricopa source is not in the appellate record, and in our discretion, we decline to take judicial notice of it.

exception for transferring permits between sources. A.R.S. § 49-429(B). For this reason, we reject Fisher's argument that the Notice to ADEQ of its intent to relocate the portable plant to the El Mirage facility satisfied the permitting statutes and regulations. Filing the Notice did not excuse Fisher's duty to disclose the existence of a new source or its responsibility to obtain a new permit based upon that new source's total emission potential under A.A.C. R18-2-302(A).

¶24        The parties agree the co-location of the portable and Maricopa sources created a new stationary source. Fisher did not obtain a new permit for the new source as required, and was therefore in violation of the Consent Judgment.

### C.        ADEQ Did Not Implicitly Authorize Co-Location through Fisher's General Permit.

¶25        Fisher next argues that even if a new permit is required for the co-located facility, failure to obtain a separate permit was not a violation of state law because the ADEQ general permit for the portable source did not contain an express prohibition of the co-location of multiple hot mix asphalt plants. To support this position, Fisher relies on the "General Permit Shield," which states:

> Each general permit issued . . . shall specifically identify all federal, state, and local air pollution control requirements applicable to the source at the time the permit is issued. . . . [C]ompliance with the conditions of the permit shall be deemed compliance with any applicable requirement in effect on the date of permit issuance.

A.A.C. R18-2-508. Seizing upon this language, Fisher argues its compliance with the express terms of the general permit, under which it obtained an ATO for the portable source, shielded it from liability for any violation not expressly contained within the general permit. Fisher's argument, however, is unpersuasive.

¶26        ADEQ does not argue that co-location, in and of itself, is a violation of state law and disallowed. Nor does ADEQ assert the co-location here caused Fisher to violate the ATO it obtained under ADEQ's general permit. Rather, ADEQ asserts, and Fisher concedes, the co-location of the sources created a *new* source, separate and apart from the portable source operated under the general permit. Therefore, the "general permit shield" for the portable source did not protect the newly created source from non-compliance with applicable permitting requirements.

### D. ADEQ Had Authority to Enforce the Portable Source Permit Until Fisher Obtained a New Permit.

¶27 Fisher next argues that even if it operated the new source without a permit, ADEQ lacked authority to bring an enforcement action. Specifically, Fisher asserts Maricopa County has exclusive permitting and enforcement authority over the new source because "it would have been . . . a portable source that would have operated exclusively in Maricopa County for the life of such a permit." We disagree.

¶28 ADEQ has original jurisdiction over sources, permits and violations that pertain to "air pollution by portable sources." A.R.S. § 49-402(A)(6). Where a "portable source . . . will operate for the duration of its permit solely in one county," its operator shall obtain a permit from that particular county. A.A.C. R18-2-324(A). However, Fisher never obtained a permit for the portable source from Maricopa County; *a fortiori*, ADEQ was entitled to bring an enforcement action until a county permit was obtained.

### E. Estoppel Does Not Apply.

¶29 Fisher further argues ADEQ is estopped from enforcing the Consent Judgment based upon operation of the new source without a permit because, it alleges, ADEQ advised Fisher that only a "Notice to Move" pursuant to A.A.C. R18-2-324(D) was needed in order to co-locate the portable source.[6] Fisher claims it relied upon this representation, filing its Notice and taking no further action prior to the co-location.

¶30 To prevail on a claim for estoppel requires: "'(1) the party to be estopped commits acts inconsistent with a position it later adopts; (2) reliance by the other party; and (3) injury to the latter resulting from the former's repudiation of its prior conduct.'" *Gorman v. Pima Cnty.*, 230 Ariz. 506, 510-11, ¶ 21, 287 P.3d 800, 804-05 (App. 2012) (quoting *Valencia Energy Co. v. Ariz. Dep't of Revenue*, 191 Ariz. 565, 576-77, ¶ 35, 959 P.2d 1256, 1267-68 (1998)). Additionally, "[w]hen applied to a government actor, the actions relied upon must bear some 'considerable degree of formalism.'" *Id*. at 511, ¶ 21, 287 P.3d at 805 (quoting *Valencia Energy*, 191 Ariz. at 577, ¶ 36, 959 P.2d at 1268). Unwritten agreements and casual acts or advice generally do not suffice. *Id.* Moreover, estoppel applies only to authorized acts of government officials when necessary to prevent injustice — not when its

---

[6] Fisher further claims, without evidentiary support, that Maricopa County also confirmed that no additional permits were required for the co-location.

application would be detrimental to the public interest. *Id.* (citations omitted).

¶31 Here, the formalism component is lacking. Fisher offers no written representation from ADEQ authorizing co-location of its sources without additional permitting, and relies solely on self-serving statements from its manager claiming an ADEQ permit engineer advised it need only file a move notice before relocating its portable source adjacent to the Maricopa source. Notably, the identified ADEQ permit engineer averred he was never informed by Fisher that it was co-locating sources, and further stated he was not capable of authorizing any such co-location. On this record, we find no merit in Fisher's estoppel argument.

### F. ADEQ's Position is Not a Collateral Attack on Fisher's Permits.

¶32 Fisher alternatively argues ADEQ's action is a collateral attack on its permits. This argument rests upon a mischaracterization of this case.

¶33 ADEQ is not challenging the validity of any permit issued to an individual source operated by Fisher. Instead, ADEQ alleges a violation of state law based upon the lack of any permit for the *new* source created through the co-location of the portable source and Maricopa source. The combined source operated for almost a year without a permit. For this reason, Fisher's reliance upon federal cases interpreting Federal Clean Air Act permits and the EPA's effort to penalize operators for violations of construction permits is misplaced, and does not provide basis for reversal. *See, e.g.*, *United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 283-87 (3d Cir. 2013).[7]

---

[7] Equally unavailing is Fisher's argument that ADEQ should have moved to revoke its permit if it believed it issued Fisher an incorrect permit. ADEQ has never maintained that it issued an incorrect permit to Fisher. Rather, the issue is whether Fisher's co-location and operation of the two individually permitted sources, in the absence of a new permit for the combined operations, violated state law. Effectively, each of the sources operated legally under their original permitting, but the new source could not be operated legally under either of the prior permits or under those permits jointly.

## G. Fisher Received Due Process.

¶34 We further reject Fisher's argument that ADEQ violated Fisher's due process rights under the Arizona and U.S. Constitutions by pursuing penalties without providing notice that its failure to secure a new permit was prohibited. Specifically, it argues no statute or regulation expressly prohibited the co-location of two permitted sources without obtaining a new permit. We disagree.

¶35 Due process guarantees notice of a claimed violation and the opportunity to defend against it. *In re Brady*, 186 Ariz. 370, 373, 923 P.2d 836, 839 (1996). It does not require "perfect notice, absolute precision, or impossible standards." *Berenter v. Gallinger*, 173 Ariz. 75, 81, 839 P.2d 1120, 1126 (App. 1992).

¶36 Fisher concedes the co-location of the two individually permitted plants created a new, larger source. At the time of the co-location, the law required any stationary source, such as the one created at Fisher's El Mirage facility, to obtain a permit before commencing construction, operation, or modification of that stationary source. A.A.C. R18-2-302(A) (2011). As a sophisticated air pollutant source operator, who had previously entered into a Consent Judgment with ADEQ for prior violations of air pollution statutes and who had permitting experience, Fisher was aware of this requirement, as set forth in the applicable statutes and regulations.

¶37 Fisher contends that subsequent amendments to A.A.C. R18-2-513 demonstrate it did not have notice of restrictions on co-locating individually permitted sources. Although ADEQ amended A.A.C. R18-2-513 to "[c]larify obligations of portable sources subject to general permit" in 2012, *see* 18 A.A.R. 1554 (July 6, 2012), the amendment did not alter the circumstances under which a permit is required.[8] *Id.* at 1638-39. Instead, the amendment simply clarified the regulation by delineating specific

---

[8] The amended rule provides that when moving a portable source covered by a general permit, the owner must provide all information previously identified within the regulation, as well as: "6. A complete equipment list of all equipment that will be located at the new location; and 7. Revised emissions calculations demonstrating that the equipment at the new location continues to qualify for the general permit under which the source has coverage." A.A.C. R18-2-513.

additional information that must be provided prior to the relocation or co-location of a portable source.

¶38      Fisher is and was bound by the requirement that the new stationary source it created by co-locating two existing sources required a new permit to operate. *See City of Mesa v. Killingsworth*, 96 Ariz. 290, 297, 394 P.2d 410, 414 (1964) ("An amendment which, in effect, construes and clarifies a prior statute will be accepted as the legislative declaration of the original act."). The mere fact that the prior version of A.A.C. R18-2-513 was not as detailed does not give rise to a constitutional violation or excuse Fisher's failure to obtain the relevant permit. *See 3613 Ltd. v. Dep't of Liquor Licenses & Control*, 194 Ariz. 178, 184, ¶ 24, 978 P.2d 1282, 1288 (App. 1999) (explaining general language in regulation is appropriate to "cover a variety of factual situations" without "unduly limit[ing its] application"); *People v. Lapcheske*, 86 Cal. Rptr. 2d 565, 568 (Ct. App. 1999) (explaining that the fact that legislature "clarified existing law by adding language that expressly prohibited the type of conduct defendant committed" did not mean that the conduct was not prohibited by the previous statute).

### H.    Fisher Consented To Daily Sanctions for Violations of State Law.

¶39      Fisher alternatively contests the trial court's imposition of daily sanctions for a continuing violation of state law, rather than imposing sanctions for a single violation, based upon its failure to obtain a new permit for the newly created stationary source. As previously detailed, Fisher committed conduct sanctionable under the Consent Judgment by creating a new source and operating it without a permit. Paragraph IX(B) of the Consent Judgment states:

> If the State elects to collect stipulated penalties, the Defendant agrees to pay a penalty as follows:
>
> 1. For violation of any provision of any applicable air quality permit issued by ADEQ that limits the quantity or concentration of air emissions, or beginning actual construction of, or operation of, equipment without a permit:

| Days of Violation | Stipulated Penalty |
| --- | --- |
| Day 1 – 30 | $5,000 per day, per violation |

| Day 31 – 60 | $6,000 per day, per violation |
| Day 61+ | $7,000 per day, per violation |

¶40        The Consent Judgment clearly and unambiguously provides that Fisher is subject to daily sanctions for violations of state law. *See Emp'rs Mut. Cas. Co. v. McKeon*, 170 Ariz. 75, 79, 821 P.2d 766, 770 (App. 1991) ("A settlement agreement should be construed as an ordinary contract.") (citation omitted); *Isaak v. Mass. Indem. Life Ins. Co.*, 127 Ariz. 581, 584, 623 P.2d 11, 14 (1981) (holding a clear and unambiguous contract must be interpreted according to its terms "even if its enforcement is harsh") (citing *Goodman v. Newzona Inv. Co.*, 101 Ariz. 470, 473-74, 421 P.2d 318, 321-22 (1966)).

¶41        If Fisher sought an alternative penalty structure, it could have negotiated the point prior to settlement and entry of the Consent Judgment. However, because Fisher agreed to pay these penalties, it is bound by the terms it accepted unless and until the underlying judgment itself is overturned, an issue not before this Court. *Lamb v. Superior Court*, 127 Ariz. 400, 403, 621 P.2d 906, 909 (1980) ("[A] judgment or order is still an effective and valid judgment or order unless and until it is set aside . . . or its enforcement enjoined in an independent action."). We therefore reject Fisher's argument.[9]

## IV.    Fisher Operated Crushers Omitted from its General Permit Application.

¶42        During an April 2014 inspection, ADEQ discovered two pieces of crushing machinery operating at Fisher's Peoria plant that were not listed in its Crushing and Screening General Permit. ADEQ charged that operation of the crushers violated A.R.S. § 49-426(A)(2) and A.A.C. R18-2-302(A). Fisher does not dispute it operated the crushers without a

---

[9]        Fisher also argues it is fundamentally unfair to allow ADEQ to wait a year after receiving notice of the relocation of the portable source before conducting a site inspection and then claim a continuing violation. We are unpersuaded by this argument. There is nothing in the record indicating the site inspection was delayed in bad faith; nor is there anything to suggest the timing of the site inspection ran afoul of ADEQ's protocols. Moreover, while ADEQ alleged, without objection, that the new source operated for 355 days without a permit, it only sought damages for approximately 82 days of operation. Therefore, on this record, we cannot say the award was fundamentally unfair.

permit, but rather contends, pursuant to A.A.C. R18-2-503(C), it had submitted an application for an ATO (the day of the inspection), and therefore was entitled to "operate under the terms of its application" while it was pending.

¶43        However, in order for the protection of A.A.C. R18-2-503(C) to apply, the application must be "complete," A.A.C. R18-2-503(A), meaning that it "contains all the information necessary for processing." A.A.C. R18-2-301(5) (defining complete).  Fisher's application was not complete because it lacked required emissions calculations and the signature of the primary responsible official.  *See* A.A.C. R18-2-503(A) (requiring compliance plan in accordance with A.A.C. R18-2-309 and adopting standard application form contained in Appendix 1).

¶44        Because Fisher's incomplete permit application did not comport with A.A.C. R18-2-503, it did not constitute an application, *per se*. *See* A.R.S. § 49-426(K) ("If an applicant has submitted a timely and complete application for a permit required under this section, but final action has not been taken on that application, failure to obtain a permit shall not be a violation of this chapter *unless the delay in final action is due to the failure of the applicant to submit information required or requested to process the application*.") (emphasis added).  Therefore, there was no "application period," and Fisher was not entitled to operate in the absence of a permit.  Accordingly, we uphold Fisher's liability for operation of the crushers.

## CONCLUSION

¶45        We affirm the trial court's rulings in favor of ADEQ.  Both parties requested attorneys' fees on appeal.  In our discretion, we deny both requests.  As the prevailing party, ADEQ is entitled to its costs on appeal contingent upon its compliance with Arizona Rule of Civil Appellate Procedure 21.


**B R O W N**, Judge, specially concurring in part, dissenting in part:

¶46        I agree with the majority's conclusion that Fisher violated A.A.C. R18-2-503 by failing to list two crushers in its Crushing and Screening General Permit for the Peoria plant.  I disagree, however, that Arizona law prohibited Fisher from co-locating its hot mix asphalt plant (a properly permitted portable source) together with a different hot mix plant

and other equipment located at the El Mirage facility (a properly permitted stationary source) without first obtaining a new permit.

¶47 The 2011 consent judgment between Fisher and ADEQ provided for stipulated penalties for any "civil violations of A.R.S. Title 49, Chapter 3, Article 2, rules adopted thereunder, or air quality permits issued thereunder" committed by Fisher in the two years following the judgment. ADEQ argues that because Fisher placed two hot mix plants on the same property, it was required to obtain a single new permit covering both plants. ADEQ, however, does not cite compelling legal authority for its conclusion that Fisher's co-location of the two plants is allowed only under a single permit.

¶48 The term "co-location" does not appear in A.R.S. Title 49, Chapter 3, Article 2, or the corresponding regulations. Thus, neither the legislature nor ADEQ has adopted any provision of law stating that co-location of multiple permitted sources is prohibited. More specifically, nothing in the statutes or regulations relied on by ADEQ states that a company cannot move a portable source to a location where a stationary source exists. Instead, the applicable regulation specifically allows a portable source to "be transferred from one location to another provided that the owner or operator of such equipment notifies the Director and any control officer who has jurisdiction over the geographic area that includes the new location[.]" A.A.C. R18-2-324(D).[10]

---

[10] The transfer notification must include:

1. A description of the equipment to be transferred including the permit number for such equipment;

2. A description of the present location;

3. A description of the location to which the equipment is to be transferred, including the availability of all utilities, such as water and electricity, necessary for the proper operation of all control equipment;

4. The date on which the equipment is to be moved; and

5. The date on which operation of the equipment will begin at the new location.

A.A.C. R18-2-324(D)(1) – (5).

¶49            Moreover, ADEQ has not cited, nor has my research revealed, any statute or regulation stating that a particular source, including a stationary source, may operate only under a single permit.  Nor is there any language prohibiting the operation of a source under two or more permits. The relevant statute provides that a permit shall "[b]e required for . . . any person beginning actual construction of or operating any source[.]" A.R.S. § 49-426(A)(2).  At the time of Fisher's alleged violation, the regulation requiring a source to be permitted provided: "No person shall commence construction of, operate, or make a modification to any source subject to regulation under this Article, without obtaining a permit or permit revision from the Director."  A.A.C. R18-2-302(A) (2011).

¶50            Fisher properly applied for and obtained a permit for its hot mix plant, a portable source, which allowed Fisher to operate the source in Maricopa County, as well as any other county in Arizona.  ADEQ does not dispute that Fisher also properly obtained a permit from Maricopa County to operate a stationary source at its El Mirage facility.  The record indicates further that Fisher complied with the equipment transfer procedure outlined in A.A.C. R18-2-324(D) that was in effect at the time Fisher relocated its portable source.  Thus, after relocation, Fisher had two permits in effect:  one for the portable source (hot mix plant transferred from Gila Bend), and the other for the stationary source (El Mirage facility).

¶51            Furthermore, neither of those permits was extinguished or otherwise became invalid. *See* A.A.C. R18-2-510 ("Terminations of General Permits and Revocations of Authority to Operate Under a General Permit"). Instead, the regulations suggest just the opposite.  If a company complies with the transfer notice, then a reasonable assumption is that the permit for a portable source remains valid, even if the proposed location is the site of a stationary source.  Otherwise, requiring a transfer notice would serve no meaningful purpose when a company proposes moving a portable source to a location where a stationary source exists because an entirely new permit would be required to continue to operate the sources.  Under the authority granted to it by the legislature, ADEQ may regulate co-location as it deems appropriate; however, the regulations in effect at the time Fisher moved its hot mix plant from Gila Bend to the El Mirage facility did not prohibit the relocation.  If ADEQ desires to require a new permit whenever a portable source is co-located with a stationary source, then it may do so by adopting language in its regulations to that effect.

¶52            Given Fisher's compliance with the notice of transfer provision, and because no other law required Fisher to obtain a new permit

after relocating a portable source adjacent to a stationary source permitted by Maricopa County, Fisher did not operate its hot mix asphalt plants in violation of Arizona law at the El Mirage facility. I therefore respectfully dissent from that portion of the majority opinion. I would vacate the trial court's order imposing the $500,000 penalty against Fisher, and remand for entry of an amended order reflecting imposition of the $10,000 penalty relating to the two crushers.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama