981 P.2d 129

George PINGITORE and Kris Pingitore, husband and wife, Plaintiffs–Appellees,

v.

TOWN OF CAVE CREEK, a political subdivision of the State of Arizona; the Town Council of the Town of Cave Creek, a Legislative Body of the Town of Cave Creek; and The Board of Adjustment, an Administrative Body of the Town of Cave Creek, Defendants–Appellants.

No. 1 CA–CV 97–0311.

Court of Appeals of Arizona, Division 1, Department C.

July 7, 1998.

Reconsideration Denied July 29, 1998.

Review Denied Feb. 23, 1999.

Francis J. Slavin, P.C. by Francis J. Slavin, Chad H. Kolodisner, Phoenix, Attorneys for Plaintiffs–Appellees.

Newmark Irvine by Thomas K. Irvine, Stephen C. Newmark, Ellen M. Van Riper, Phoenix, Attorneys for Defendants–Appellants.

EHRLICH, Judge.

¶ 1 The Town of Cave Creek, its Town Council and its Board of Adjustment appeal from the superior court's entry of summary judgment in favor of George and Kris Pingitore. The Pingitores sought relief from the court after the Board affirmed two orders issued by the Town halting construction of the Pingitores' residence. In granting the Pingitores summary judgment, the court concluded that (1) the Town's zoning ordinance is unconstitutionally vague, (2) the Pingitores have a vested right to complete construction of their residence at the planned site and (3) the Town is estopped from enforcing certain zoning restrictions precluding the Pingitores from building their home at that site. For the reasons discussed below, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 The Pingitores own property on Black Mountain in Cave Creek on which they want to build a home. In July 1992, they applied to the Town for a permit to extend Old Schoolhouse Road up the side of the mountain for use as a driveway to the site of their future residence. In October 1992, after the Town Engineer had reviewed their plans, the Town issued the Pingitores a permit for construction of the driveway.

¶ 3 At this time, the property was zoned R–70. Under this zoning, the Pingitores were allowed to build their residence on the property as long as their plans met the requirements of the Hillside Development Overlay District ("Hillside Regulations") and the yard, height and lot size requirements of the R–70 zoning classification.

¶ 4 In February 1993, after a plan review of the project, the Town advised the Pingitores that their driveway, as now partially built, potentially violated the Hillside Regulations. After Mr. Pingitore met with the Town's Supervising Engineer and the Town Manager to discuss the Town's concerns, the Town staff advised the Pingitores to apply to the Board for a variance allowing them to complete the driveway.

¶ 5 The Pingitores duly applied for the variance, seeking permission to pave a driveway that exceeded the Hillside Regulations' width and height limitations for exposed cut-and-fill slopes. In December 1993, the Board approved the variance, subject to additional requirements that the Pingitores revegetate disturbed areas within 18 months of the date of the variance and install a large water-storage tank on the property to comply with fire-safety standards applicable to their planned residence.

¶ 6 In January 1994, the Town Mayor told the Board that, if it did not reconsider the variance with the imposition of additional conditions, the Town Council would appeal the grant of the variance to the superior court. The Pingitores then agreed to pave the driveway within the 18 months in which they were to complete the revegetation and landscaping work. Approximately $60,000 has been expended in constructing the driveway.

¶ 7 In October 1994, the Town Engineer sent a memorandum to the Town Manager explaining that the property owners on Black Mountain would have to excavate two to three acres of the mountain to install a proper wastewater system. The engineer warned that such an excavation would scar the mountain for several years, but he added that scarring could be avoided if the property owners connected to the Town's wastewater system through underground sewer lines. He advised that the easiest and most cost-effective method of installing such sewer lines was to run them along the driveway being constructed by the Pingitores. Thereafter, the Pingitores agreed to extend a sewer line to the site of their residence and applied for the required permit. The Town granted this permit in December 1994, and the Pingitores finished the backfill of the trench dug for the installation of the sewer line in April 1995, expending approximately $11,000 in installing the line.

¶ 8 In August 1995, the Pingitores applied for a building permit to install the water-storage tank and booster-pump stations dictated by the Town to comply with its fire-safety standards. The Town granted

this permit, and the Pingitores spent approximately $8800 installing these items.

¶ 9   About this time, the Town approved a zoning clearance for the Pingitores' residence conditioned upon their satisfaction of minimum setback requirements.   This required the Pingitores to obtain a lot-line adjustment prior to the issuance of a building permit. To comply with these provisos, the Pingitores joined 2.5 acres of a five-acre parcel adjacent to their property, which they purchased for $220,000, to the five-acre parcel on which they intended to build their residence.

¶ 10   A later Town Planning Staff report said that the Pingitores' proposed lot-line adjustment now conformed to the zoning requirements.   Thus, the Pingitores applied for a building permit to construct their residence, including with their application a complete set of plans and drawings for review by the Town's engineering staff.   In September 1995, a Town official advised the Pingitores' architect that certain changes to the plans were needed before the Town could approve the plans and issue a building permit.

¶ 11   On September 25, 1995, the Pingitores posted a grading bond of $8250.   On October 2, the Town declared that the conditions of the zoning clearance had been satisfied, and it granted the Pingitores a permit for the grading of their site.   The Pingitores contracted with a grading company for preparation of the site.   The price for this work is $45,000, and the Pingitores have paid the first bill of $7068.09.

¶ 12   The Pingitores also hired Desert Southwest Construction as the contractor for the construction of their residence.   Under this contract, they face $96,000 in liability.

¶ 13   In July 1994, while the Pingitores were in the midst of this project, the Town adopted an ordinance creating a new zoning district, the Mountain Preservation Zone ("MP Zone"), which includes the Pingitores' property.   In the MP Zone, structures may not be constructed above the twenty-degree-horizontal plane of any "ridge line," which term is undefined.

¶ 14   On October 23, 1995, the Town Zoning Administrator issued a stop-work order directing that the Pingitores cease construction of their residence.   The Town's stated basis for the order was the Pingitores' failure to comply with the time limitations for completing the revegetation and paving stipulations attached to the driveway variance. However, the Town Manager later admitted that the order was actually issued because the Town was uncertain whether the building restrictions imposed by the MP Zone applied to the Pingitores' property.

¶ 15   The Pingitores appealed the Zoning Administrator's stop-work order to the Board.   On November 28, the Town Zoning Administrator issued the Pingitores a second stop-work order for violating the MP Zone provisions.   The Pingitores also appealed the issuance of this order to the Board.

¶ 16   On December 12, the Board heard the Pingitores' appeal of both orders.   At this proceeding, the Pingitores were advised for the first time that the Town Zoning Administrator had determined that they were building on a ridge line in violation of the MP Zone ordinance.   The Pingitores asserted that the Town's Zoning Ordinance and Map were invalidly adopted and therefore void. They also contended that the MP Zone ordinance is unconstitutionally vague because it fails to define the term "ridge line" and that application of the ordinance and the Hillside Regulations to their property constituted a regulatory taking.   They further claimed a vested right to construct their residence at the proposed site, and they asserted that the Town was estopped from preventing that construction.   The Board continued the hearing to January 10, 1996, at which time it affirmed the Zoning Administrator's orders.

¶ 17   The Pingitores sought and received relief from the Board's order in the superior court.   In granting the Pingitores summary judgment, the court concluded that (1) the MP Zone ordinance was unconstitutionally vague, (2) the Pingitores had a vested right to build their home at the original site, and (3) the Town was estopped from prohibiting them from building at that site.   Because of these rulings, the court declined to determine whether the zoning ordinance was validly adopted.   The Town appealed, raising three issues:

1. Whether the Town's MP Zone ordinance is unconstitutionally vague;

2. Whether the Board acted arbitrarily, capriciously and in abuse of its discretion in finding that the Pingitores did not have a vested right to build their residence at the proposed site; and

3. Whether the Board acted arbitrarily, capriciously and in abuse of its discretion in determining that the Town was not estopped from denying the Pingitores the right to build their residence at the original site.

## DISCUSSION

### I. Standard of Review.

■ ¶ 18 In reviewing the Board's decision, both the superior court and this court must determine whether the Board acted arbitrarily, capriciously or in an abuse of its discretion. *Murphy v. Town of Chino Valley*, 163 Ariz. 571, 574, 789 P.2d 1072, 1075 (App.1989). Neither court may substitute its opinion of the facts for that of the Board. *Id.* Rather, if there is credible evidence to support the Board's decision, it must be affirmed. *Id.* However, when the issues are ones of statutory interpretation, the Board's interpretation of the law is subject to *de novo* review. *Id.*

### II. Record on Appeal.

■ ¶ 19 The Town asserts that this court should ignore the bulk of the record on appeal and limit review to the items attached to its Opening Brief because the Pingitores failed to submit a certified record of the Board proceedings to the superior court. The Town made this same argument in superior court, moving to strike many of the exhibits filed by the Pingitores. While the court did not rule on this motion, it implicitly denied it by appearing to rely on some of the material submitted by the Pingitores in ruling on their motion for summary judgment.

¶ 20 The record on appeal consists of all "original papers, exhibits, minute entries, and other objects filed with the clerk of the superior court...." ARIZ. R. CIV.APP. P. 11(a)(1); *see also* ARIZ.REV.STAT. ANN. ("A.R.S.") § 41–1061(E)(1992). The Pingitores rely only on pleadings and exhibits that were filed with the clerk of the superior court; they do not refer to material not before that court. Further, the Town has not asserted that the exhibits filed by the Pingitores fail to accurately depict the record before the Board.[1]

■ ¶ 21 In reviewing the Board's decisions, both the superior court and this court rely on the record before the Board; there is no trial *de novo*. *Neal v. City of Kingman*, 169 Ariz. 133, 135, 817 P.2d 937, 939 (1991); *Lane v. City of Phoenix*, 169 Ariz. 37, 40, 816 P.2d 934, 937 (App.1991). Because it appears that the record before the superior court accurately represented the record before the Board, we consider the pleadings and exhibits filed in the superior court. *See Mendez v. Arizona State Bd. of Pharmacy*, 129 Ariz. 89, 91, 628 P.2d 972, 974 (App. 1981).[2]

¶ 22 Additionally, striking the bulk of the documents submitted by the Pingitores would be unjust in light of the Town's actions in the superior court. After this issue arose, the parties agreed that the Pingitores would compile a complete version of the administrative record, which the Town would review for additions or corrections and submit to the court. The Pingitores compiled the record as agreed and provided a copy to the Town, but the Town never submitted the record to the court. Instead, it opposed the Pingitores' motion to compel it to file the same,

---

1. The Town identified only one item filed by the Pingitores that was not before the Board at the time of its decision, and that was the affidavit of George Pingitore. However, this affidavit focuses on events occurring after the Board's decision, namely the Town's continued refusal to issue the Pingitores a building permit despite their compliance with the structural requirements of the Uniform Building Code.

2. In support of its position that the Pingitores bore the burden of filing a certified record of the administrative record in the superior court, the Town notes that neither A.R.S. section 9–462.06(K)(1996) nor the administrative provisions of its zoning ordinance require it to transmit the administrative record to the superior court. However, those provisions also fail to place that burden on the Pingitores. A.R.S. § 9–462.06(K); CAVE CREEK, ARIZ., ZONING ORDINANCE § 16–1–2 (1994).

asserting that, since the court had already ruled on the parties' motions and had sufficient information to render its decision, the submission of any additional information would unduly confuse the issues and burden the court with irrelevant information. The court denied the Pingitores' motion and allowed the record to stand as submitted to that point. Because the Town was content with the status of the record at that juncture, it may not challenge its accuracy or sufficiency on appeal.

### III. Estoppel.

■ ¶ 23 The Town claims that it cannot be estopped from preventing the Pingitores from building their residence at the planned site. It relies on its status as a sovereign acting to protect the public interest. We disagree.

¶ 24 The supreme court decision in *Valencia Energy v. Arizona Dep't of Revenue*, 191 Ariz. 565, 959 P.2d 1256 (1998), provides the analytical framework. The court began with a reminder that, in *Freightways v. Arizona Corp. Comm'n*, 129 Ariz. 245, 248, 630 P.2d 541, 544 (1981), it announced its disapproval of the "no estoppel against the sovereign" rule. *Id.* at ¶ 11. Quoting *Freightways*, 129 Ariz. at 248, 630 P.2d at 544, it repeated:

> [I]t would appear that where the application of estoppel will not affect the exercise by the state of its governmental powers and sovereignty, or bind it by unauthorized acts of its officers and employees, estoppel will, when justice dictates, be applied to the state.

*Id.* Thus, a governmental entity may be estopped from proceeding further in its course unless such action is "to the detriment of the public interest." *Id.* at ¶ 32 (citing *Spur Industries v. Del E. Webb Dev. Co.*, 108 Ariz. 178, 184, 494 P.2d 700, 706 (1972)). The court then reiterated the three elements of equitable estoppel: "(1) the party to be estopped commits acts inconsistent with a position it later adopts; (2) reliance by the other party; and (3) injury to the latter resulting from the former's repudiation of its prior conduct." *Id.* at ¶ 35.

¶ 25 The evidentiary burden to be borne in establishing the first element requires a "considerable degree of formalism," usually a written document. *Id.* at ¶ 36. Further, the action claimed to be relied upon by the party asserting estoppel must have been taken by or have had the approval of one authorized to act in that circumstance. *Id.* In this case, the Town, through its agents, issued a variety of permits and variances to the Pingitores that were necessary for the Pingitores to build at their desired location. While no building permit for the residence yet had been approved, a zoning clearance for the home had been issued. The Pingitores also had submitted an application for the permit to which was attached a complete set of building plans and drawings, and, while the written response from the Town dictated certain changes, it did not implicate the placement of the site. These actions by the Town are inconsistent with its later issuance of the stop-work orders.

¶ 26 To establish the second element, the Pingitores had to show that they actually relied on the Town's actions and that their confidence was "reasonable under the circumstances." *Id.* at ¶ 37. As set forth above, several of the expensive projects undertaken by the Pingitores in anticipation of building on the designated site were at the Town's request or insistence. As such, these permits and variances were conditions for the Pingitores to be allowed by the Town to build their home on their Black Mountain property. The Pingitores justifiably believed that the Town intended that they could continue to act on its assurances in the form of its issuance of the requisite documents and that it would allow them to construct their residence at the declared site. Reliance was reasonable under these circumstances.

¶ 27 Finally, the Pingitores were obliged to demonstrate that they suffered "substantial detriment ... resulting from a repudiation of prior representations" to establish the third element. *Id.* at ¶ 38. Certainly they incurred substantial expense in preparing the site. They also will suffer further financial losses if now forbidden from proceeding with the construction.

¶ 28   Permitting the Town to be estopped assumes, though, that "the public interest will not be unduly damaged" and that there will be no "substantial[ ] and adverse[ ] effect on the exercise of governmental powers." *Id.* at ¶ 40 (citing *Freightways,* 129 Ariz. at 248, 630 P.2d at 544.)

¶ 29   We recognize the force of the proposition that estoppel should be applied against the Government with utmost caution and restraint, for it is not a happy occasion when the Government's hands, performing duties in behalf of the public, are tied by the acts and conduct of particular officials in their relations with particular individuals.

*Id.* at ¶ 41 (quoting *Schuster v. Commissioner,* 312 F.2d 311, 317 (9th Cir.1962) (citations omitted)).

¶ 30   In this case, while the legislative policy of the Town has changed since the Pingitores began the construction of their home, no governmental authority will be unduly circumscribed by an application of estoppel, and equity favors its application.

 ¶ 31   The Town next maintains that the superior court's order must be reversed because it conditions the Pingitores' right to build their house on the site with their compliance with all other zoning ordinances. The Town claims that this provision of the order is inconsistent and will lead to further disputes.   However, this provision protects the Town, not the Pingitores.   Further, neither party has asserted that the Pingitores' plan violates other provisions of the Zoning Code so this issue is not ripe for adjudication. *See Winkle v. City of Tucson,* 190 Ariz. 413, 415, 949 P.2d 502, 504 (1997)("The ripeness doctrine prevents a court from rendering a premature judgment or opinion on a situation that may never occur.").   To the extent that other zoning disputes arise, the parties may resolve them through the administrative and judicial procedures of which they availed themselves to resolve this matter.

¶ 32   The superior court properly concluded that the Board acted arbitrarily and capriciously and abused its discretion.   The Town is estopped from enforcing the "ridge line" restrictions of the MP Zone against the Pingitores and thereby halting their construction.

Because we find that the court correctly applied the doctrine of estoppel in this case, we need not address the Pingitores' other contentions.

## CONCLUSION

¶ 33   We affirm the judgment of the superior court.

GRANT, P.J., and SULT, J., concur.