NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

TERRY SILK and MELINDA SILK, husband and wife; THOMAS
SHERMAN and CHRISTINE SHERMAN, husband and wife; and
RICHARD GAUTREAU, *Plaintiffs/Appellants*,

*v.*

ERIC BLODGETT and GAIL BLODGETT, husband and wife,
*Defendants/Appellees.*

---

TERRY SILK and MELINDA SILK, husband and wife, and THOMAS
SHERMAN and CHRISTINE SHERMAN, husband and wife,
*Plaintiffs/Appellants*,

*v.*

LAKE HAVASU CITY, an Arizona municipal corporation; LAKE
HAVASU CITY BOARD OF ADJUSTMENT, a quasi-judicial body of
LAKE HAVASU CITY; STUART SCHMELING, in his official capacity as
ZONING ADMINISTRATOR FOR LAKE HAVASU CITY,
*Defendants/Appellees,*

and

ERIC BLODGETT and GAIL BLODGETT, husband and wife, *Defendants
and Real Parties in Interest/Appellees.*

---

No. 1 CA-CV 22-0506
FILED 5-23-2023

---

Appeal from the Superior Court in Mohave County
No. L8015CV202107033

**REVERSED IN PART AND REMANDED**

―――――――――――――

COUNSEL

Aspey Watkins & Diesel, PLLC, Flagstaff
By Whitney Cunningham, Trevor T. Kortsen
*Counsel for Plaintiffs/Appellants*

Provident Law PLLC, Scottsdale
By Philip A. Overcash, Christopher J. Charles, Blake Wilkie,
Erik W. Stanley
*Counsel for Defendants/Appellees Eric Blodgett and Gail Blodgett*

Sims Mackin, Phoenix
By Kristin M. Mackin
*Counsel for Defendants/Appellees Lake Havasu City, Lake Havasu City Zoning*
*Administration Board of Adjustment, and Stuart Schmeling*

―――――――――――――

**MEMORANDUM DECISION**

Judge Michael S. Catlett delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Michael J. Brown joined.

―――――――――――――

**C A T L E T T**, Judge:

¶1 The Lake Havasu City Zoning Administrator ("Administrator") issued a building permit to Eric and Gail Blodgett ("Blodgetts") to construct an approximately 18,000 square-foot addition to their existing home. The Administrator determined the proposed building plans did not violate Lake Havasu City's Development Code ("Code"). Terry and Melinda Silk ("Silks"), the Blodgetts' neighbors, appealed the permitting decision to the Lake Havasu City Board of Adjustment ("Board"), and subsequently to the superior court. The Silks argued the Administrator did not follow zoning clearance procedures, the addition's height exceeded the maximum height allowed, and the addition rendered

the Blodgetts' home a two-family dwelling, inconsistent with the property's current zoning. The Board and the superior court both upheld the permit.

¶2　　　　We agree with the Silks that the Code dictates a procedure for obtaining and issuing a zoning clearance that neither the Blodgetts nor the Administrator followed. We further conclude that, because the Administrator correctly calculated the maximum height for the Blodgetts' addition, the addition's height does not violate the Code. And because the addition is not currently designed to allow two families to live independently from one another, the structure does not constitute an impermissible two-family dwelling.

## FACTS AND PROCEDURAL BACKGROUND

¶3　　　　In 2005, the Lake Havasu City Council approved a modification of the City's subdivision code to allow the Blodgetts to combine two adjacent lots. One lot, located at 2015 Eagle Lane, contained their existing home. The other, located at 2010 Palmer Drive, was a vacant lot directly behind their existing home.

¶4　　　　Fifteen years passed with no activity. Then, in October 2020, the Blodgetts sought approval to construct a residential and garage addition to their existing home on Eagle Lane. The addition extends across the vacant Palmer Drive lot and adds over 7,000 square feet of living space to the Blodgetts' existing home; coupled with a garage and terraces, the addition alone is over 18,000 square feet under roof. With the existing home, the total structure has over 20,000 square feet under roof.

¶5　　　　Once the Administrator determined the building plans met the Code's requirements, he issued a building permit. The Administrator did not issue a separate zoning clearance, instead explaining that, for residential projects, review of the building plans and issuance of a building permit also satisfies the zoning clearance requirement.

¶6　　　　The Silks filed a notice of appeal with the Board challenging the Administrator's zoning clearance procedure and determination that the addition does not violate the Code's height restrictions. The Board held a hearing, at which the Silks not only argued the zoning clearance and building height issues, but also that the addition would convert the Blodgetts' existing home into an impermissible two-family dwelling—an issue not listed in the Silks' notice of appeal. The Board heard testimony on all issues, affirmed the Administrator's determinations, and dismissed the appeal.

¶7        Pursuant to A.R.S. § 9-462.06, the Silks challenged the Board's decision through a statutory special action in superior court. The superior court applied an arbitrary and capricious standard of review and upheld the Board's decision. The Silks timely appealed, and we have jurisdiction under A.R.S. § 12-2101.

## DISCUSSION

### I.        Standard of Review

¶8        The Silks first argue the superior court incorrectly applied an arbitrary and capricious standard of review across the board, even to questions of ordinance interpretation. We agree.

¶9        When reviewing the Board's decision, we generally determine whether the decision was arbitrary, capricious, or an abuse of discretion, and we may not substitute our opinion of the facts for that of the Board even if we might make a different factual finding. *M & M Auto Storage Pool, Inc. v. Chem. Waste Mgmt., Inc.*, 164 Ariz. 139, 142–43 (App. 1990). We will affirm the Board's factual decisions if there is credible evidence to support them. *Pingitore v. Town of Cave Creek*, 194 Ariz. 261, 264 ¶ 18 (App. 1998). When, however, the Board interprets an ordinance, that interpretation is subject to *de novo* review, and we are also free to substitute our "judgment for the Board's assessment of the legal effect of the underlying facts." *Whiteco Outdoor Advert. v. City of Tucson*, 193 Ariz. 314, 317 ¶ 7 (App. 1998); *see also Wade v. Ariz. St. Ret. Sys.*, 241 Ariz. 559, 561 ¶ 10 (2017).

¶10        Applying these principles here, when reviewing the legal interpretation of an ordinance the superior court was not required "to defer to the interpretation[s] of the [Administrator] unless [they] are arbitrary and capricious." The court, thus, should not have deferred to the Board's interpretation of the Code's provisions or the legal effect of the underlying facts. For example, the Board's legal interpretations regarding the process for a zoning clearance and the maximum height allowed for a residential structure are not entitled to deference. On the other hand, the Board's factual determinations underlying the question whether the addition means the property is now designed to allow two families to live independently from one another are subject to abuse of discretion review, although our resolution of that issue does not turn on the applicable standard of review.

## II.    Zoning Clearance

¶11        The parties agree the Administrator must conduct a zoning clearance review and issue a zoning clearance whenever a building permit is issued.  The parties disagree, though, on the procedure the Administrator must follow to complete that process.  This requires us to interpret the language in the Code.

¶12        We interpret ordinances using principles of statutory construction.  *Thomas & King, Inc. v. City of Phoenix*, 208 Ariz. 203, 206 ¶ 9 (App. 2004).  When interpreting an ordinance, we look first to its plain language.  *Glazer v. State*, 244 Ariz. 612, 614 ¶ 9 (2018).  "[W]hen that language is unambiguous, we apply it without resorting to secondary statutory interpretation principles."  *SolarCity Corp. v. Ariz. Dep't of Revenue*, 243 Ariz. 477, 480 ¶ 8 (2018).  When an ordinance does not define a term, we may utilize dictionary definitions.  *Shepherd v. Costco Wholesale Corp.*, 250 Ariz. 511, 515 ¶ 20 (2021).

¶13        The Silks contend the Code required the Blodgetts to file a document separate from their building permit application to obtain a zoning clearance.  And the way the Silks view it, the Administrator was then required to separately grant, in writing, a zoning clearance and a building permit.  The City disputes that interpretation.  The City interprets the Code as allowing the Administrator to complete the zoning clearance process as part of the building permit process—with only a building permit application and building permit being filed and issued.  The City says the building permit is sufficient evidence of the zoning clearance.

¶14        We agree with the Silks' interpretation.  The zoning clearance is "[a]n authorization issued by the Department *prior to* issuance of any building permit to ensure that the proposed use and/or construction complies with all of the provisions of this Development Code."  Lake Havasu City, Dev. Code § 14.06.03(Z) (2016) (emphasis added) ("Dev. Code").  The Code contains the following requirement to obtain a zoning clearance:  "A zoning clearance for a structure that is to be erected or remodeled shall be *filed in conjunction with the companion* building permit application[.]"  Dev. Code § 14.05.04(A)(1)(a) (emphasis added).  The Code also instructs that "[t]he Zoning Administrator shall issue the zoning clearance after determining that the proposed development/improvement complies with all of the applicable standards and provisions . . . [of] this Development Code."  Dev. Code § 14.05.04(A)(2).

¶15         Thus, the Code creates a two-step process for obtaining a zoning clearance.  Step one requires a person seeking a building permit to file a request for a zoning clearance.  Step two requires the Administrator to review the plans to determine compliance with the Code and then, if in compliance, issue a zoning clearance.  At step one, the Code's plain language confirms that those seeking a building permit must "*file*" an additional document to obtain a zoning clearance "*in conjunction with the companion*" building permit application.  Dev. Code § 14.05.04(A)(1)(a) (emphasis added).  The phrase "in conjunction with"[1] is defined as "in combination with" or "together with," and "companion"[2] means "one that accompanies another."  Read together in context, the Code plainly requires a building permit applicant to file a zoning clearance request document to accompany a building permit application.

¶16         The Code's plain language also confirms that upon receipt of both a zoning clearance request and building permit application, and after the Administrator determines Code compliance, he is required to issue a zoning clearance "prior to," and thus necessarily separate from, the building permit.  "Prior to" means "in advance of" or "before."[3]  Because the Code requires that a zoning clearance issue before a building permit, a building permit cannot be issued as a substitute for a zoning clearance.

¶17         The Silks do not seriously maintain that the Administrator failed to conduct a zoning clearance review.  Even if they had, the record supports the Administrator conducted the substance of what the zoning clearance review process requires by identifying the portions of the Code implicated and reviewing the building plans to ensure compliance.  But processes also matter, and the Administrator did not follow the required process here.

¶18         The City explains that the reason "the building permit review process includes the review required for the issuance of [a] zoning clearance [is] to avoid unnecessarily duplicative applications and fees[.]"  That goal is laudable, but applicants and the Administrator must follow the written requirements in the Code (or the City must amend the Code).  Building

---

[1]      *In    Conjunction    With*,    Merriam-Webster's    Dictionary, https://www.merriam-webster.com/dictionary/in%20conjunction%20 with (last visited May 16, 2023).

[2]      *Companion*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/companion (last visited May 16, 2023).

[3]      *Prior To*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/prior%20to (last visited May 16, 2023).

permit applicants must file a document accompanying their building permit application to obtain a zoning clearance, and the Administrator must separately grant a zoning clearance before issuing a final building permit. Because the Blodgetts and the Administrator did not follow that process, the current building permit is void. *See* Dev. Code § 14.05.04(A)(3).

### III.   Maximum Height Restriction

**¶19**          Although we conclude the Administrator did not follow the Code's procedural requirements, and therefore the current building permit is void, the two other issues the parties press on appeal are likely to arise again on remand. We, therefore, address those issues as well.

**¶20**          The Silks argue the Administrator erred because the Blodgetts' addition exceeds the maximum thirty-foot height restriction for properties zoned "residential estate." *See* Dev. Code § 14.02.03(B). According to the Silks, the Administrator was required to calculate the building's height based on the average lot grade of the Blodgetts' combined lot. We disagree.

**¶21**          How maximum lot height is determined is a matter of ordinance interpretation we review *de novo*. *See Whiteco Outdoor Advert.*, 193 Ariz. at 317 ¶ 7. The Code explains that a building's maximum height "shall be measured as the vertical distance from approved grade to an imaginary plane located [30] feet above and parallel to the average lot grade." Dev. Code §§ 14.06.02(C)(1), 14.02.03(B)(1). The term "grade" refers to the elevation of the lot's actual ground surface. *See* Dev. Code § 14.06.03(G) ("Grade" is defined as "[t]he ground surface immediately adjacent to the exterior base of a structure, typically used as the basis for measurement of the height of the structure."). The question we answer is, how does one properly determine the "approved grade" or "average lot grade"?

**¶22**          Preliminarily, the City asserts that "approved grade" and "average lot grade" both refer to the starting line for measuring maximum height. We agree for the most part. Neither term is expressly defined in the Code. The Code, however, uses both terms to mean the starting line for measuring height. For example, the Administrator is required to use the "approved grade" of the centerline of the street in front of a downward-sloping lot, and the "average lot grade" of an upward sloping lot to determine the maximum height for each, respectively. *See* Dev. Code § 14.05.04(E)(2), (3). There is no indication in the Code that, practically speaking, the terms have different meanings, at least in the context of

ensuring compliance with maximum height restrictions. Thus, for present purposes, the two terms in the Code have the same meaning—the starting point for measuring maximum height.

### A. Downward Sloping Lot

**¶23** Lot slope (or lack thereof) plays a significant role in determining a structure's maximum allowable height under the Code. If a lot is flat, measuring maximum height is simple. If a lot is sloping, the task becomes more complex. After the Blodgetts combined the Eagle Lane and Palmer Drive lots, the overall lot became sloping. But deciding whether a lot slopes upward or downward is a matter of perspective—one man's downward sloping lot could be another man's upward sloping lot. Thankfully, the Code provides guidance on determining whether a particular lot slopes upward or downward.

**¶24** For a lot to slope downward, it must have "a major portion of the lot grade lying below the base elevation[.]" Dev. Code § 14.05.04(E)(3)(a) (emphasis added). "Base elevation" is "the elevation of the centerline of the street opposite the front lot corner that provides the highest street elevation." Dev. Code § 14.06.03(B). To calculate base elevation, the Administrator must take the front two corners of a lot, select the one with a higher elevation, and then use the elevation at the centerline of the street facing that lot corner.[4] That centerline elevation is the lot's base elevation.

**¶25** Here, because the Blodgetts' lot fronts on Eagle Lane, the Administrator used the grade of the front two lot corners facing that street (i.e., the front two corners of the original structure). The elevation at the centerline of the street (Eagle Lane) facing the higher of those two corners was 100, which is the base elevation of the Blodgetts' lot. The lot's elevation decreases significantly toward Palmer Drive, resulting in an average lot elevation of 86.25. The average lot elevation is lower than the lot's base elevation (86.25<100), so the Blodgetts' lot is downward sloping (all parties agree).

**¶26** The Code explains that a downward sloping lot "may be filled to accommodate a building pad area *no more than 1 foot above the base elevation*." Dev. Code § 14.05.04(E)(3)(a) (emphasis added). Under the Code's interpretation section, it instructs that "may is permissive." Dev.

---

[4] The elevation of a lot's corners as well as the elevation at the centerline of any given street is information provided to the City by a registered land surveyor.

Code § 14.06.01(B). In other words, the Blodgetts could (but are not required to) fill the entirety of their lot to achieve a base elevation of 101 (and then build 30 feet above that to an elevation of 131). An owner may fill a downward sloping lot to its base elevation plus one foot and then build to the maximum of thirty feet above that elevation; we, thus, see no reason why an owner cannot build to that same elevation without filling the downward sloping lot. The Code does not say otherwise. On the contrary, our interpretation is consistent with an illustration in the Code, which shows the maximum height for flat and sloping lots. *See* Dev. Code § 14.06.02(C)(1); *infra* ¶ 29.

**¶27** Because the Blodgetts' lot slopes downward, we reject the Silks' argument that the Administrator was instead required to measure maximum height off the lot's average grade of 86.25. A lot's average grade is used for calculating height for upward, not downward, sloping lots. *See* Dev. Code § 14.05.04(E)(2). Adopting the Silks' interpretation would mean the Blodgetts' could never have combined their two adjacent lots without their original home violating the Code's maximum height restrictions, an absurd result. *See Bustos v. W.M. Grace Dev.*, 192 Ariz. 396, 398 (App. 1997) (explaining statutory interpretations should not lead to absurd results).

**¶28** The "approved grade" or starting line from which height is calculated for a downward sloping lot is, therefore, the base elevation plus one foot. For the Blodgetts' lot, the approved grade is 101 (100+1).

### B. Calculating Maximum Height

**¶29** The approved grade of 101 is the starting point for calculating the 30-foot maximum height of the Blodgetts' addition. A building's maximum height is "measured as the vertical distance from approved grade to an imaginary plane located the allowed number of feet above and parallel to the [approved] grade." Dev. Code § 14.06.02(C)(1). The Code provides this helpful illustration:



Figure 1 - Height Measurement:

¶**30**        As applied to the Blodgetts' lot, the Administrator took the base elevation of 101 as the "approved grade."  The Administrator then drew a straight line at the approved grade across the Blodgetts' property, starting at Eagle Lane and ending at Palmer Drive.  As depicted in the above illustration, the bottom dotted line remains at the same grade (here, 101) regardless of where the actual land is in relation to that line.   The Administrator then drew another vertical line 30 feet above the 101 grade. It is at the top of this 30-foot line where the imaginary plain, representing the maximum height for the entire lot, is located.   For the Blodgetts' property, the Administrator drew the imaginary plane straight across, parallel to, and 30 feet above the approved grade of 101.  The Administrator concluded that so long as all structures were built below that imaginary plane, they comply with the Code.   After reviewing the plans, the Administrator determined that none of the Blodgetts' proposed addition would exceed the imaginary plane 30 feet above the approved grade of 101, as illustrated below:



Our legal interpretation of the Code's height provisions leads to the same conclusion—the Blodgetts' addition does not violate the Code's height restrictions.

## IV.    Two-Family Dwelling

**¶31**        The Silks lastly argue that the Blodgetts' addition constitutes a prohibited two-family dwelling.  Relying on *Neal v. City of Kingman*, 169 Ariz. 133 (1991), the Blodgetts argue the Silks waived this argument because they did not raise it in their notice of appeal to the Board.  The Silks respond that the Blodgetts waived their waiver argument—so double waiver—because they failed to raise waiver with the Board or the superior court. While the City notes the Silks did not raise the two-family dwelling issue in the notice of appeal, the City does not really press waiver, instead acknowledging that "the Board heard sufficient testimony upon which it correctly found that the Development Code does not require invalidation of the building permit[.]"  Assuming the Blodgetts have standing to assert a waiver argument the City does not squarely press, the party to waive last loses the waiver battle.  Thus, the Blodgetts waived their waiver argument by failing to sufficiently raise it before the Board or the superior court.[5]  *See Harris v. Cochise Health Sys.*, 215 Ariz. 344, 349 ¶ 17 (App. 2007) ("[A]n appellate court will not consider issues not raised in the trial court.").

**¶32**        In any event, we find for the City and the Blodgetts on the merits of the Silks' argument.  The Silks rely on the definition of a two-family dwelling in the Code, which is "[a] building containing two primary use *dwelling units*, with separate exterior entrances, designed to be occupied by two families living independently of each other."   Dev. Code § 14.16.03(D) (emphasis added).  A "dwelling unit" is defined as "[o]ne or more rooms in a dwelling designed as a unit for occupancy by one family for living or sleeping purposes and having *not more than one kitchen*."  Dev. Code § 14.16.03(D) (emphasis added).  The Silks assert that the Blodgetts' addition meets the definition of "dwelling unit" because it has a separate exterior entrance and, under the Silks' interpretation of the building plans, adds a second kitchen.  The Silks argue that when combined with the Blodgetts' current residence, which is a dwelling unit, the addition makes two dwelling units on the property, violating the property's current zoning as "residential estate."

**¶33**        The City, on the other hand, argues the question of whether a home is a single or a two-family dwelling is factual, turning on whether the home is designed to be used by one or two families.  The building plans the

---

[5]        At most, in the superior court, the Blodgetts joined the City's statement that while the Silks had not raised the two-family dwelling issue with the Board until oral argument, the Board heard sufficient testimony to decide the issue.

City approved show a room labeled "wet bar." The plans for that room depict a sink, counters, a refrigerator, and the room is adjacent to a dining room. The plans do not depict a stove or oven. The plans show the existence of a separate exterior entrance; however, the addition and the current home are connected by a breezeway.

**¶34**        Unlike the first two questions we have answered, which were largely legal, we agree with the City that determining whether a particular structure is "designed for" a particular purpose is primarily a factual inquiry. Thus, "if there is credible evidence to support the Board's decision, it must be affirmed." *See Pingitore*, 194 Ariz. at 264 ¶ 18.

**¶35**        The record adequately supports the Board's conclusion that the Blodgetts' addition is not designed to house two families living independently from one another. Again, while the building plans depict a wet bar, which the Silks characterize as a kitchen or "an area to prepare and serve food," this area is missing a key ingredient needed to prepare food— cooking facilities such as a stove or oven. *See Kitchen*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/ kitchen (last visited May 16, 2023) ("a place (such as a room) with *cooking facilities*" (emphasis added)). Further, the addition is open to the existing house and connected through a breezeway. Finally, while not dispositive, the Blodgetts, through counsel, represented to the Board that, "The residents of this home will be Eric and Gail Blodgett, no one else."

**¶36**        The Silks downplay the property's current design by claiming the breezeway could one day be "blocked off" to separate the addition from the current house. The Code uses language—"containing" and "designed" being two examples—focused on the here and now, not the future. It is conceivable many properties subject to the City's zoning regulations could one day be re-designed in a manner altering their zoning compliance. But what matters is whether the property is *currently* designed for occupancy by more than one family. If in the future, the Blodgetts, or a subsequent owner, turn the addition into a second dwelling unit, the Administrator has authority under the Code to take corrective action. *See* Dev. Code §§ 14.05.06 *et seq.* The evidence now in the record though reasonably supports that the Blodgetts would need to make alterations to block off the breezeway and further equip the wet bar, or take other actions to change the design or use, before the property would become a two-family dwelling under the Code. We do not think the Board committed any legal error or abused its discretion by rejecting the Silks' two-family dwelling argument.

## ATTORNEYS' FEES

¶37 Both the Silks and the Blodgetts request attorneys' fees under A.R.S. § 12-348(A)(4), which states this Court "shall award fees and other expenses to any party other than . . . a city . . . that prevails by an adjudication on the merits . . . of . . . [a] special action proceeding brought by the party to challenge an action by . . . a city[.]"  Because we hold that the current building permit is void, the Silks have prevailed on their special action proceeding.  We, thus, award them their attorneys' fees and costs against the City (but not the Blodgetts) upon compliance with Arizona Rule of Civil Appellate Procedure 21.  *See also* A.R.S. § 12-348(E).  Because the Blodgetts are not a party *challenging* an action by the City, their request for attorneys' fees is denied.

## CONCLUSION

¶38 We reverse in part the superior court's judgment and remand for further proceedings consistent herewith.



AMY M. WOOD • Clerk of the Court
FILED:    AA